(Slip Opinion) OCTOBER TERM, 2017 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## LUCIA ET AL. *v.* SECURITIES AND EXCHANGE COMMISSION

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 17–130.  Argued April 23, 2018—Decided June 21, 2018

The Securities and Exchange Commission (SEC or Commission) has statutory authority to enforce the nation's securities laws.  One way it can do so is by instituting an administrative proceeding against an alleged wrongdoer.  Typically, the Commission delegates the task of presiding over such a proceeding to an administrative law judge (ALJ).  The SEC currently has five ALJs.  Other staff members, rather than the Commission proper, selected them all.  An ALJ assigned to hear an SEC enforcement action has the "authority to do all things necessary and appropriate" to ensure a "fair and orderly" adversarial proceeding.  17 CFR §§201.111, 200.14(a).  After a hearing ends, the ALJ issues an initial decision.  The Commission can review that decision, but if it opts against review, it issues an order that the initial decision has become final.  See §201.360(d).  The initial decision is then "deemed the action of the Commission."  15 U. S. C. §78d–1(c).

The SEC charged petitioner Raymond Lucia with violating certain securities laws and assigned ALJ Cameron Elliot to adjudicate the case.  Following a hearing, Judge Elliot issued an initial decision concluding that Lucia had violated the law and imposing sanctions.  On appeal to the SEC, Lucia argued that the administrative proceeding was invalid because Judge Elliot had not been constitutionally appointed.  According to Lucia, SEC ALJs are "Officers of the United States" and thus subject to the Appointments Clause.  Under that Clause, only the President, "Courts of Law," or "Heads of Departments" can appoint such "Officers."  But none of those actors had made Judge Elliot an ALJ.  The SEC and the Court of Appeals for the D. C. Circuit rejected Lucia's argument, holding that SEC ALJs are

not "Officers of the United States," but are instead mere employees—officials with lesser responsibilities who are not subject to the Appointments Clause.

*Held*: The Commission's ALJs are "Officers of the United States," subject to the Appointments Clause. Pp. 5–13.

(a) This Court's decisions in *United States* v. *Germaine,* 99 U. S. 508, and *Buckley* v. *Valeo,* 424 U. S. 1, set out the basic framework for distinguishing between officers and employees. To qualify as an officer, rather than an employee, an individual must occupy a "continuing" position established by law, *Germaine,* 99 U. S., at 511, and must "exercis[e] significant authority pursuant to the laws of the United States," *Buckley*, 424 U. S., at 126.

In *Freytag* v. *Commissioner,* 501 U. S. 868, the Court applied this framework to "special trial judges" (STJs) of the United States Tax Court. STJs could issue the final decision of the Tax Court in "comparatively narrow and minor matters." *Id.*, at 873. In more major matters, they could preside over the hearing but could not issue a final decision. Instead, they were to "prepare proposed findings and an opinion" for a regular Tax Court judge to consider. *Ibid.* The proceeding challenged in *Freytag* was a major one. The losing parties argued on appeal that the STJ who presided over their hearing was not constitutionally appointed.

This Court held that STJs are officers. Citing *Germaine*, the *Freytag* Court first found that STJs hold a continuing office established by law. See 501 U. S., at 881. The Court then considered, as *Buckley* demands, the "significance" of the "authority" STJs wield. 501 U. S., at 881. The Government had argued that STJs are employees in all cases in which they could not enter a final decision. But the Court thought that the Government's focus on finality "ignore[d] the significance of the duties and discretion that [STJs] possess." *Ibid.* Describing the responsibilities involved in presiding over adversarial hearings, the Court said: STJs "take testimony, conduct trials, rule on the admissibility of evidence, and have the power to enforce compliance with discovery orders." *Id.,* at 881–882. And the Court observed that "[i]n the course of carrying out these important functions," STJs "exercise significant discretion." *Id.*, at 882.

*Freytag*'s analysis decides this case. The Commission's ALJs, like the Tax Court's STJs, hold a continuing office established by law. SEC ALJs "receive[ ] a career appointment," 5 CFR §930.204(a), to a position created by statute, see 5 U. S. C. §§556–557, 5372, 3105. And they exercise the same "significant discretion" when carrying out the same "important functions" as STJs do. *Freytag*, 501 U. S., at 882. Both sets of officials have all the authority needed to ensure fair and orderly adversarial hearings—indeed, nearly all the tools of fed-

Syllabus

eral trial judges. The Commission's ALJs, like the Tax Court's STJs, "take testimony," "conduct trials," "rule on the admissibility of evidence," and "have the power to enforce compliance with discovery orders." *Id.,* at 881–882. So point for point from *Freytag*'s list, SEC ALJs have equivalent duties and powers as STJs in conducting adversarial inquiries.

Moreover, at the close of those proceedings, SEC ALJs issue decisions much like that in *Freytag*. STJs prepare proposed findings and an opinion adjudicating charges and assessing tax liabilities. Similarly, the Commission's ALJs issue initial decisions containing factual findings, legal conclusions, and appropriate remedies. And what happens next reveals that the ALJ can play the more autonomous role. In a major Tax Court case, a regular Tax Court judge must always review an STJ's opinion, and that opinion comes to nothing unless the regular judge adopts it. By contrast, the SEC can decide against reviewing an ALJ's decision, and when it does so the ALJ's decision itself "becomes final" and is "deemed the action of the Commission." 17 CFR §201.360(d)(2); 15 U. S. C. §78d–1(c). Pp. 5–11.

(b) Judge Elliot heard and decided Lucia's case without a constitutional appointment. "[O]ne who makes a timely challenge to the constitutional validity of the appointment of an officer who adjudicates his case" is entitled to relief. *Ryder* v. *United States,* 515 U. S. 177, 182. Lucia made just such a timely challenge. And the "appropriate" remedy for an adjudication tainted with an appointments violation is a new "hearing before a properly appointed" official. *Id.,* at 183, 188. In this case, that official cannot be Judge Elliot, even if he has by now received a constitutional appointment. Having already both heard Lucia's case and issued an initial decision on the merits, he cannot be expected to consider the matter as though he had not adjudicated it before. To cure the constitutional error, another ALJ (or the Commission itself) must hold the new hearing. Pp. 12–13.

868 F. 3d 1021, reversed and remanded.

KAGAN, J., delivered the opinion of the Court, in which ROBERTS, C. J., and KENNEDY, THOMAS, ALITO, and GORSUCH, JJ., joined. THOMAS, J., filed a concurring opinion, in which GORSUCH, J., joined. BREYER, J., filed an opinion concurring in the judgment in part and dissenting in part, in which GINSBURG and SOTOMAYOR, JJ., joined as to Part III. SOTOMAYOR, J., filed a dissenting opinion, in which GINSBURG, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 17–130

RAYMOND J. LUCIA, ET AL., PETITIONERS *v.*
SECURITIES AND EXCHANGE COMMISSION

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[June 21, 2018]

JUSTICE KAGAN delivered the opinion of the Court.

The Appointments Clause of the Constitution lays out the permissible methods of appointing "Officers of the United States," a class of government officials distinct from mere employees. Art. II, §2, cl. 2. This case requires us to decide whether administrative law judges (ALJs) of the Securities and Exchange Commission (SEC or Commission) qualify as such "Officers." In keeping with *Freytag* v. *Commissioner*, 501 U. S. 868 (1991), we hold that they do.

I

The SEC has statutory authority to enforce the nation's securities laws. One way it can do so is by instituting an administrative proceeding against an alleged wrongdoer. By law, the Commission may itself preside over such a proceeding. See 17 CFR §201.110 (2017). But the Commission also may, and typically does, delegate that task to an ALJ. See *ibid.*; 15 U. S. C. §78d–1(a). The SEC currently has five ALJs. Other staff members, rather than the Commission proper, selected them all. See App. to Pet. for Cert. 295a–297a.

An ALJ assigned to hear an SEC enforcement action has extensive powers—the "authority to do all things necessary and appropriate to discharge his or her duties" and ensure a "fair and orderly" adversarial proceeding. §§201.111, 200.14(a). Those powers "include, but are not limited to," supervising discovery; issuing, revoking, or modifying subpoenas; deciding motions; ruling on the admissibility of evidence; administering oaths; hearing and examining witnesses; generally "[r]egulating the course of" the proceeding and the "conduct of the parties and their counsel"; and imposing sanctions for "[c]ontemptuous conduct" or violations of procedural requirements. §§201.111, 201.180; see §§200.14(a), 201.230. As that list suggests, an SEC ALJ exercises authority "comparable to" that of a federal district judge conducting a bench trial. *Butz* v. *Economou*, 438 U. S. 478, 513 (1978).

After a hearing ends, the ALJ issues an "initial decision." §201.360(a)(1). That decision must set out "findings and conclusions" about all "material issues of fact [and] law"; it also must include the "appropriate order, sanction, relief, or denial thereof." §201.360(b). The Commission can then review the ALJ's decision, either upon request or *sua sponte.* See §201.360(d)(1). But if it opts against review, the Commission "issue[s] an order that the [ALJ's] decision has become final." §201.360(d)(2). At that point, the initial decision is "deemed the action of the Commission." §78d–1(c).

This case began when the SEC instituted an administrative proceeding against petitioner Raymond Lucia and his investment company. Lucia marketed a retirement savings strategy called "Buckets of Money." In the SEC's view, Lucia used misleading slideshow presentations to deceive prospective clients. The SEC charged Lucia under the Investment Advisers Act, §80b–1 *et seq.*, and assigned ALJ Cameron Elliot to adjudicate the case. After nine

days of testimony and argument, Judge Elliot issued an initial decision concluding that Lucia had violated the Act and imposing sanctions, including civil penalties of $300,000 and a lifetime bar from the investment industry. In his decision, Judge Elliot made factual findings about only one of the four ways the SEC thought Lucia's slideshow misled investors. The Commission thus remanded for factfinding on the other three claims, explaining that an ALJ's "personal experience with the witnesses" places him "in the best position to make findings of fact" and "resolve any conflicts in the evidence." App. to Pet. for Cert. 241a. Judge Elliot then made additional findings of deception and issued a revised initial decision, with the same sanctions. See *id.,* at 118a.

On appeal to the SEC, Lucia argued that the administrative proceeding was invalid because Judge Elliot had not been constitutionally appointed. According to Lucia, the Commission's ALJs are "Officers of the United States" and thus subject to the Appointments Clause. Under that Clause, Lucia noted, only the President, "Courts of Law," or "Heads of Departments" can appoint "Officers." See Art. II, §2, cl. 2. And none of those actors had made Judge Elliot an ALJ. To be sure, the Commission itself counts as a "Head[] of Department[]." *Ibid.*; see *Free Enterprise Fund* v. *Public Company Accounting Oversight Bd.*, 561 U. S. 477, 511–513 (2010). But the Commission had left the task of appointing ALJs, including Judge Elliot, to SEC staff members. See *supra,* at 1. As a result, Lucia contended, Judge Elliot lacked constitutional authority to do his job.

The Commission rejected Lucia's argument. It held that the SEC's ALJs are not "Officers of the United States." Instead, they are "mere employees"—officials with lesser responsibilities who fall outside the Appointments Clause's ambit. App. to Pet. for Cert. 87a. The Commission reasoned that its ALJs do not "exercise significant

authority independent of [its own] supervision." *Id.,* at 88a. Because that is so (said the SEC), they need no special, high-level appointment. See *id.,* at 86a.

Lucia's claim fared no better in the Court of Appeals for the D. C. Circuit. A panel of that court seconded the Commission's view that SEC ALJs are employees rather than officers, and so are not subject to the Appointments Clause. See 832 F. 3d 277, 283–289 (2016). Lucia then petitioned for rehearing en banc. The Court of Appeals granted that request and heard argument in the case. But the ten members of the en banc court divided evenly, resulting in a *per curiam* order denying Lucia's claim. See 868 F. 3d 1021 (2017). That decision conflicted with one from the Court of Appeals for the Tenth Circuit. See *Bandimere* v. *SEC*, 844 F. 3d 1168, 1179 (2016).

Lucia asked us to resolve the split by deciding whether the Commission's ALJs are "Officers of the United States within the meaning of the Appointments Clause." Pet. for Cert. i. Up to that point, the Federal Government (as represented by the Department of Justice) had defended the Commission's position that SEC ALJs are employees, not officers. But in responding to Lucia's petition, the Government switched sides.[1] So when we granted the petition, 583 U. S. ___ (2018), we also appointed an *amicus curiae* to defend the judgment below.[2] We now reverse.

––––––––––

[1] In the same certiorari-stage brief, the Government asked us to add a second question presented: whether the statutory restrictions on removing the Commission's ALJs are constitutional. See Brief in Response 21. When we granted certiorari, we chose not to take that step. See 583 U. S. ___ (2018). The Government's merits brief now asks us again to address the removal issue. See Brief for United States 39–55. We once more decline. No court has addressed that question, and we ordinarily await "thorough lower court opinions to guide our analysis of the merits." *Zivotofsky* v. *Clinton*, 566 U. S. 189, 201 (2012).

[2] We appointed Anton Metlitsky to brief and argue the case, 583 U. S. ___ (2018), and he has ably discharged his responsibilities.

II

The sole question here is whether the Commission's ALJs are "Officers of the United States" or simply employees of the Federal Government. The Appointments Clause prescribes the exclusive means of appointing "Officers." Only the President, a court of law, or a head of department can do so. See Art. II, §2, cl. 2.[3] And as all parties agree, none of those actors appointed Judge Elliot before he heard Lucia's case; instead, SEC staff members gave him an ALJ slot. See Brief for Petitioners 15; Brief for United States 38; Brief for Court-Appointed *Amicus Curiae* 21. So if the Commission's ALJs are constitutional officers, Lucia raises a valid Appointments Clause claim. The only way to defeat his position is to show that those ALJs are not officers at all, but instead non-officer employees—part of the broad swath of "lesser functionaries" in the Government's workforce. *Buckley* v. *Valeo*, 424 U. S. 1, 126, n. 162 (1976) (*per curiam*). For if that is true, the Appointments Clause cares not a whit about who named them. See *United States* v. *Germaine*, 99 U. S. 508, 510 (1879).

Two decisions set out this Court's basic framework for distinguishing between officers and employees. *Germaine* held that "civil surgeons" (doctors hired to perform various physical exams) were mere employees because their duties were "occasional or temporary" rather than "continuing

_____

[3] That statement elides a distinction, not at issue here, between "principal" and "inferior" officers. See *Edmond* v. *United States*, 520 U. S. 651, 659–660 (1997). Only the President, with the advice and consent of the Senate, can appoint a principal officer; but Congress (instead of relying on that method) may authorize the President alone, a court, or a department head to appoint an inferior officer. See *ibid.* Both the Government and Lucia view the SEC's ALJs as inferior officers and acknowledge that the Commission, as a head of department, can constitutionally appoint them. See Brief for United States 38; Brief for Petitioners 50–51.

and permanent." *Id.,* at 511–512. Stressing "ideas of tenure [and] duration," the Court there made clear that an individual must occupy a "continuing" position established by law to qualify as an officer. *Id.,* at 511. *Buckley* then set out another requirement, central to this case. It determined that members of a federal commission were officers only after finding that they "exercis[ed] significant authority pursuant to the laws of the United States." 424 U. S., at 126. The inquiry thus focused on the extent of power an individual wields in carrying out his assigned functions.

Both the *amicus* and the Government urge us to elaborate on *Buckley*'s "significant authority" test, but another of our precedents makes that project unnecessary. The standard is no doubt framed in general terms, tempting advocates to add whatever glosses best suit their arguments. See Brief for *Amicus Curiae* 14 (contending that an individual wields "significant authority" when he has "(i) the power to bind the government or private parties (ii) in her own name rather than in the name of a superior officer"); Reply Brief for United States 2 (countering that an individual wields that authority when he has "the power to bind the government or third parties on significant matters" or to undertake other "important and distinctively sovereign functions"). And maybe one day we will see a need to refine or enhance the test *Buckley* set out so concisely. But that day is not this one, because in *Freytag* v. *Commissioner*, 501 U. S. 868 (1991), we applied the unadorned "significant authority" test to adjudicative officials who are near-carbon copies of the Commission's ALJs. As we now explain, our analysis there (sans any more detailed legal criteria) necessarily decides this case.

The officials at issue in *Freytag* were the "special trial judges" (STJs) of the United States Tax Court. The authority of those judges depended on the significance of the tax dispute before them. In "comparatively narrow and

minor matters," they could both hear and definitively
resolve a case for the Tax Court. *Id.*, at 873. In more
major matters, they could preside over the hearing, but
could not issue the final decision; instead, they were to
"prepare proposed findings and an opinion" for a regular
Tax Court judge to consider. *Ibid.* The proceeding chal-
lenged in *Freytag* was a major one, involving $1.5 billion
in alleged tax deficiencies. See *id.,* at 871, n. 1. After
conducting a 14-week trial, the STJ drafted a proposed
decision in favor of the Government. A regular judge then
adopted the STJ's work as the opinion of the Tax Court.
See *id.,* at 872. The losing parties argued on appeal that
the STJ was not constitutionally appointed.

This Court held that the Tax Court's STJs are officers,
not mere employees. Citing *Germaine*, the Court first
found that STJs hold a continuing office established by
law. See 501 U. S., at 881. They serve on an ongoing,
rather than a "temporary [or] episodic[,] basis"; and their
"duties, salary, and means of appointment" are all speci-
fied in the Tax Code. *Ibid.* The Court then considered, as
*Buckley* demands, the "significance" of the "authority"
STJs wield. 501 U. S., at 881. In addressing that issue,
the Government had argued that STJs are employees,
rather than officers, in all cases (like the one at issue) in
which they could not "enter a final decision." *Ibid.* But
the Court thought the Government's focus on finality
"ignore[d] the significance of the duties and discretion that
[STJs] possess." *Ibid.* Describing the responsibilities
involved in presiding over adversarial hearings, the Court
said: STJs "take testimony, conduct trials, rule on the
admissibility of evidence, and have the power to enforce
compliance with discovery orders." *Id.,* at 881–882. And
the Court observed that "[i]n the course of carrying out
these important functions, the [STJs] exercise significant
discretion." *Id.,* at 882. That fact meant they were offi-

cers, even when their decisions were not final.[4]

*Freytag* says everything necessary to decide this case. To begin, the Commission's ALJs, like the Tax Court's STJs, hold a continuing office established by law. See *id.*, at 881. Indeed, everyone here—Lucia, the Government, and the *amicus*—agrees on that point. See Brief for Petitioners 21; Brief for United States 17–18, n. 3; Brief for *Amicus Curiae* 22, n. 7. Far from serving temporarily or episodically, SEC ALJs "receive[] a career appointment." 5 CFR §930.204(a) (2018). And that appointment is to a position created by statute, down to its "duties, salary, and means of appointment." *Freytag*, 501 U. S., at 881; see 5 U. S. C. §§556–557, 5372, 3105.

Still more, the Commission's ALJs exercise the same "significant discretion" when carrying out the same "important functions" as STJs do. *Freytag*, 501 U. S., at 882. Both sets of officials have all the authority needed to ensure fair and orderly adversarial hearings—indeed, nearly all the tools of federal trial judges. See *Butz*, 438 U. S., at 513; *supra,* at 2. Consider in order the four specific (if overlapping) powers *Freytag* mentioned. First, the

———————

[4] The Court also provided an alternative basis for viewing the STJs as officers. "Even if the duties of [STJs in major cases] were not as significant as we . . . have found them," we stated, "our conclusion would be unchanged." *Freytag*, 501 U. S., at 882. That was because the Government had conceded that in minor matters, where STJs could enter final decisions, they had enough "independent authority" to count as officers. *Ibid.* And we thought it made no sense to classify the STJs as officers for some cases and employees for others. See *ibid.* JUSTICE SOTOMAYOR relies on that back-up rationale in trying to reconcile *Freytag* with her view that "a prerequisite to officer status is the authority" to issue at least some "final decisions." *Post*, at 5 (dissenting opinion). But *Freytag* has two parts, and its primary analysis explicitly rejects JUSTICE SOTOMAYOR's theory that final decisionmaking authority is a *sine qua non* of officer status. See 501 U. S., at 881–882. As she acknowledges, she must expunge that reasoning to make her reading work. See *post,* at 5 ("That part of the opinion[] was unnecessary to the result").

Commission's ALJs (like the Tax Court's STJs) "take testimony." 501 U. S., at 881. More precisely, they "[r]eceiv[e] evidence" and "[e]xamine witnesses" at hearings, and may also take pre-hearing depositions. 17 CFR §§201.111(c), 200.14(a)(4); see 5 U. S. C. §556(c)(4). Second, the ALJs (like STJs) "conduct trials." 501 U. S., at 882. As detailed earlier, they administer oaths, rule on motions, and generally "regulat[e] the course of" a hearing, as well as the conduct of parties and counsel. §201.111; see §§200.14(a)(1), (a)(7); *supra,* at 2. Third, the ALJs (like STJs) "rule on the admissibility of evidence." 501 U. S., at 882; see §201.111(c). They thus critically shape the administrative record (as they also do when issuing document subpoenas). See §201.111(b). And fourth, the ALJs (like STJs) "have the power to enforce compliance with discovery orders." 501 U. S., at 882. In particular, they may punish all "[c]ontemptuous conduct," including violations of those orders, by means as severe as excluding the offender from the hearing. See §201.180(a)(1). So point for point—straight from *Freytag*'s list—the Commission's ALJs have equivalent duties and powers as STJs in conducting adversarial inquiries.

And at the close of those proceedings, ALJs issue decisions much like that in *Freytag*—except with potentially more independent effect. As the *Freytag* Court recounted, STJs "prepare proposed findings and an opinion" adjudicating charges and assessing tax liabilities. 501 U. S., at 873; see *supra,* at 7. Similarly, the Commission's ALJs issue decisions containing factual findings, legal conclusions, and appropriate remedies. See §201.360(b); *supra,* at 2. And what happens next reveals that the ALJ can play the more autonomous role. In a major case like *Freytag*, a regular Tax Court judge must always review an STJ's opinion. And that opinion counts for nothing unless the regular judge adopts it as his own. See 501 U. S., at 873. By contrast, the SEC can decide against reviewing

an ALJ decision at all. And when the SEC declines review (and issues an order saying so), the ALJ's decision itself "becomes final" and is "deemed the action of the Commission." §201.360(d)(2); 15 U. S. C. §78d–1(c); see *supra,* at 2. That last-word capacity makes this an *a fortiori* case: If the Tax Court's STJs are officers, as *Freytag* held, then the Commission's ALJs must be too.

The *amicus* offers up two distinctions to support the opposite conclusion. His main argument relates to "the power to enforce compliance with discovery orders"—the fourth of *Freytag*'s listed functions. 501 U. S., at 882. The Tax Court's STJs, he states, had that power "because they had authority to punish contempt" (including discovery violations) through fines or imprisonment. Brief for *Amicus Curiae* 37; see *id.,* at 37, n. 10 (citing 26 U. S. C. §7456(c)). By contrast, he observes, the Commission's ALJs have less capacious power to sanction misconduct. The *amicus*'s secondary distinction involves how the Tax Court and Commission, respectively, review the factfinding of STJs and ALJs. The Tax Court's rules state that an STJ's findings of fact "shall be presumed" correct. Tax Court Rule 183(d). In comparison, the *amicus* notes, the SEC's regulations include no such deferential standard. See Brief for *Amicus Curiae* 10, 38, n. 11.

But those distinctions make no difference for officer status. To start with the *amicus*'s primary point, *Freytag* referenced only the general "power to enforce compliance with discovery orders," not any particular method of doing so. 501 U. S., at 882. True enough, the power to toss malefactors in jail is an especially muscular means of enforcement—the nuclear option of compliance tools. But just as armies can often enforce their will through conventional weapons, so too can administrative judges. As noted earlier, the Commission's ALJs can respond to discovery violations and other contemptuous conduct by excluding the wrongdoer (whether party or lawyer) from

the proceedings—a powerful disincentive to resist a court order. See §201.180(a)(1)(i); *supra,* at 9. Similarly, if the offender is an attorney, the ALJ can "[s]ummarily suspend" him from representing his client—not something the typical lawyer wants to invite. §201.180(a)(1)(ii). And finally, a judge who will, in the end, issue an opinion complete with factual findings, legal conclusions, and sanctions has substantial informal power to ensure the parties stay in line. Contrary to the *amicus*'s view, all that is enough to satisfy *Freytag*'s fourth item (even supposing, which we do not decide, that each of those items is necessary for someone conducting adversarial hearings to count as an officer).

And the *amicus*'s standard-of-review distinction fares just as badly. The *Freytag* Court never suggested that the deference given to STJs' factual findings mattered to its Appointments Clause analysis. Indeed, the relevant part of *Freytag* did not so much as mention the subject (even though it came up at oral argument, see Tr. of Oral Arg. 33–41). And anyway, the Commission often accords a similar deference to its ALJs, even if not by regulation. The Commission has repeatedly stated, as it did below, that its ALJs are in the "best position to make findings of fact" and "resolve any conflicts in the evidence." App. to Pet. for Cert. 241a (quoting *In re Nasdaq Stock Market, LLC*, SEC Release No. 57741 (Apr. 30, 2008)). (That was why the SEC insisted that Judge Elliot make factual findings on all four allegations of Lucia's deception. See *supra,* at 3.) And when factfinding derives from credibility judgments, as it frequently does, acceptance is near-automatic. Recognizing ALJs' "personal experience with the witnesses," the Commission adopts their "credibility finding[s] absent overwhelming evidence to the contrary." App. to Pet. for Cert. 241a; *In re Clawson*, SEC Release No. 48143 (July 9, 2003). That practice erases the constitutional line the *amicus* proposes to draw.

The only issue left is remedial. For all the reasons we have given, and all those *Freytag* gave before, the Commission's ALJs are "Officers of the United States," subject to the Appointments Clause. And as noted earlier, Judge Elliot heard and decided Lucia's case without the kind of appointment the Clause requires. See *supra,* at 5. This Court has held that "one who makes a timely challenge to the constitutional validity of the appointment of an officer who adjudicates his case" is entitled to relief. *Ryder* v. *United States,* 515 U. S. 177, 182–183 (1995). Lucia made just such a timely challenge: He contested the validity of Judge Elliot's appointment before the Commission, and continued pressing that claim in the Court of Appeals and this Court. So what relief follows? This Court has also held that the "appropriate" remedy for an adjudication tainted with an appointments violation is a new "hearing before a properly appointed" official. *Id.*, at 183, 188. And we add today one thing more. That official cannot be Judge Elliot, even if he has by now received (or receives sometime in the future) a constitutional appointment. Judge Elliot has already both heard Lucia's case and issued an initial decision on the merits. He cannot be expected to consider the matter as though he had not adjudicated it before.[5] To cure the constitutional error,

---

[5] JUSTICE BREYER disagrees with our decision to wrest further proceedings from Judge Elliot, arguing that "[f]or him to preside once again would not violate the structural purposes [of] the Appointments Clause." *Post*, at 13 (opinion concurring in judgment in part and dissenting in part). But our Appointments Clause remedies are designed not only to advance those purposes directly, but also to create "[]incentive[s] to raise Appointments Clause challenges." *Ryder* v. *United States*, 515 U. S. 177, 183 (1995). We best accomplish that goal by providing a successful litigant with a hearing before a new judge. That is especially so because (as JUSTICE BREYER points out) the old judge would have no reason to think he did anything wrong on the merits, see *post*, at 13—and so could be expected to reach all the same judgments. But we do not hold that a new officer is required for every

another ALJ (or the Commission itself) must hold the new hearing to which Lucia is entitled.[6]

We accordingly reverse the judgment of the Court of Appeals and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

--------

Appointments Clause violation. As JUSTICE BREYER suggests, we can give that remedy here because other ALJs (and the Commission) are available to hear this case on remand. See *ibid.* If instead the Appointments Clause problem is with the Commission itself, so that there is no substitute decisionmaker, the rule of necessity would presumably kick in and allow the Commission to do the rehearing. See *FTC* v. *Cement Institute*, 333 U. S. 683, 700–703 (1948); 3 K. Davis, Administrative Law Treatise §19.9 (2d ed. 1980).

[6]While this case was on judicial review, the SEC issued an order "ratif[ying]" the prior appointments of its ALJs. Order (Nov. 30, 2017), online at https://www.sec.gov/litigation/opinions/2017/33-10440.pdf (as last visited June 18, 2018). Lucia argues that the order is invalid. See Brief for Petitioners 50–56. We see no reason to address that issue. The Commission has not suggested that it intends to assign Lucia's case on remand to an ALJ whose claim to authority rests on the ratification order. The SEC may decide to conduct Lucia's rehearing itself. Or it may assign the hearing to an ALJ who has received a constitutional appointment independent of the ratification.

# SUPREME COURT OF THE UNITED STATES

_____

No. 17–130

_____

RAYMOND J. LUCIA, ET AL., PETITIONERS *v.*
SECURITIES AND EXCHANGE COMMISSION

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[June 21, 2018]

JUSTICE THOMAS, with whom JUSTICE GORSUCH joins, concurring.

I agree with the Court that this case is indistinguishable from *Freytag* v. *Commissioner*, 501 U. S. 868 (1991). If the special trial judges in *Freytag* were "Officers of the United States," Art. II, §2, cl. 2, then so are the administrative law judges of the Securities and Exchange Commission. Moving forward, however, this Court will not be able to decide every Appointments Clause case by comparing it to *Freytag*. And, as the Court acknowledges, our precedents in this area do not provide much guidance. See *ante,* at 6. While precedents like *Freytag* discuss what is *sufficient* to make someone an officer of the United States, our precedents have never clearly defined what is *necessary*. I would resolve that question based on the original public meaning of "Officers of the United States." To the Founders, this term encompassed all federal civil officials "'with responsibility for an ongoing statutory duty.'" *NLRB* v. *SW General, Inc.*, 580 U. S. \_\_\_, \_\_\_ (2017) (THOMAS, J., concurring) (slip op., at 4); Mascott, Who Are "Officers of the United States"? 70 Stan. L. Rev. 443, 564 (2018) (Mascott).[1]

_____

[1] I address only the dividing line between "Officers of the United States," who are subject to the Appointments Clause, and nonofficer

The Appointments Clause provides the exclusive process for appointing "Officers of the United States." See *SW General*, *supra*, at ___ (opinion of THOMAS, J.) (slip op., at 1). While principal officers must be nominated by the President and confirmed by the Senate, Congress can authorize the appointment of "inferior Officers" by "the President alone," "the Courts of Law," or "the Heads of Departments." Art. II, §2, cl. 2.

This alternative process for appointing inferior officers strikes a balance between efficiency and accountability. Given the sheer number of inferior officers, it would be too burdensome to require each of them to run the gauntlet of Senate confirmation. See *United States* v. *Germaine*, 99 U. S. 508, 509–510 (1879); 2 Records of the Federal Convention of 1787, pp. 627–628 (M. Farrand ed. 1911). But, by specifying only a limited number of actors who can appoint inferior officers without Senate confirmation, the Appointments Clause maintains clear lines of accountability—encouraging good appointments and giving the public someone to blame for bad ones. See The Federalist No. 76, p. 455 (C. Rossiter ed. 1961) (A. Hamilton); Wilson, Lectures on Law: Government, in 1 The Works of James Wilson 343, 359–361 (J. Andrews ed., 1896).

The Founders likely understood the term "Officers of the United States" to encompass all federal civil officials who perform an ongoing, statutory duty—no matter how important or significant the duty. See Mascott 454. "Officers of the United States" was probably not a term of art that the Constitution used to signify some special type of official. Based on how the Founders used it and similar terms, the phrase "of the United States" was merely a

_____

employees, who are not. I express no view on the meaning of "Office" or "Officer" in any other provision of the Constitution, or the difference between principal officers and inferior officers under the Appointments Clause.

synonym for "federal," and the word "Office[r]" carried its ordinary meaning. See *id.,* at 471–479. The ordinary meaning of "officer" was anyone who performed a continuous public duty. See *id.,* at 484–507; *e.g., United States* v. *Maurice*, 26 F. Cas. 1211, 1214 (No. 15,747) (CC Va. 1823) (defining officer as someone in "'a public charge or employment'" who performed a "continuing" duty); 8 Annals of Cong. 2304–2305 (1799) (statement of Rep. Harper) (explaining that the word officer "is derived from the Latin word *officium*" and "includes all persons holding posts which require the performance of some public duty"). For federal officers, that duty is "established by Law"—that is, by statute. Art. II, §2, cl. 2. The Founders considered individuals to be officers even if they performed only ministerial statutory duties—including recordkeepers, clerks, and tidewaiters (individuals who watched goods land at a customhouse). See Mascott 484–507. Early congressional practice reflected this understanding. With exceptions not relevant here,[2] Congress required all federal officials with ongoing statutory duties to be appointed in compliance with the Appointments Clause. See *id.,* at 507–545.

Applying the original meaning here, the administrative law judges of the Securities and Exchange Commission easily qualify as "Officers of the United States." These judges exercise many of the agency's statutory duties, including issuing initial decisions in adversarial proceedings. See 15 U. S. C. §78d–1(a); 17 CFR §§200.14, 200.30–9 (2017). As explained, the importance or significance of these statutory duties is irrelevant. All that matters is that the judges are continuously responsible for perform-

——————

[2] The First Congress exempted certain officials with ongoing statutory duties, such as deputies and military officers, from the requirements of the Appointments Clause. But these narrow exceptions do not disprove the rule, as background principles of founding-era law explain each of them. See Mascott 480–483, 515–530.

ing them.

In short, the administrative law judges of the Securities Exchange Commission are "Officers of the United States" under the original meaning of the Appointments Clause. They have "'responsibility for an ongoing statutory duty,'" which is sufficient to resolve this case. *SW General*, 580 U. S., at ___ (opinion of THOMAS, J.) (slip op., at 4). Because the Court reaches the same conclusion by correctly applying *Freytag*, I join its opinion.

# SUPREME COURT OF THE UNITED STATES

———————

No. 17–130

———————

## RAYMOND J. LUCIA, ET AL., PETITIONERS *v.* SECURITIES AND EXCHANGE COMMISSION

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[June 21, 2018]

JUSTICE BREYER, with whom JUSTICE GINSBURG and JUSTICE SOTOMAYOR join as to Part III, concurring in the judgment in part and dissenting in part.

I agree with the Court that the Securities and Exchange Commission did not properly appoint the Administrative Law Judge who presided over petitioner Lucia's hearing. But I disagree with the majority in respect to two matters. First, I would rest our conclusion upon statutory, not constitutional, grounds. I believe it important to do so because I cannot answer the constitutional question that the majority answers without knowing the answer to a different, embedded constitutional question, which the Solicitor General urged us to answer in this case: the constitutionality of the statutory "for cause" removal protections that Congress provided for administrative law judges. Cf. *Free Enterprise Fund* v. *Public Company Accounting Oversight Bd.*, 561 U. S. 477 (2010). Second, I disagree with the Court in respect to the proper remedy.

I

The relevant statute here is the Administrative Procedure Act. That Act governs the appointment of administrative law judges. It provides (as it has, in substance, since its enactment in 1946) that "[e]ach agency shall appoint as many administrative law judges as are neces-

sary for" hearings governed by the Administrative Proce-
dure Act. 5 U. S. C. §3105; see also Administrative Proce-
dure Act, §11, 60 Stat. 244 (original version, which refers
to "examiners" as administrative law judges were then
called). In the case of the Securities and Exchange Com-
mission, the relevant "agency" is the Commission itself.
But the Commission did not appoint the Administrative
Law Judge who presided over Lucia's hearing. Rather, the
Commission's staff appointed that Administrative Law
Judge, without the approval of the Commissioners them-
selves. See *ante,* at 1; App. to Pet. for Cert. 298a–299a.

I do not believe that the Administrative Procedure Act
permits the Commission to delegate its power to appoint
its administrative law judges to its staff. We have held
that, for purposes of the Constitution's Appointments
Clause, the Commission itself is a "'Hea[d]'" of a "'De-
partmen[t].'" *Free Enterprise Fund*, *supra*, at 512–513.
Thus, reading the statute as referring to the Commission
itself, and not to its staff, avoids a difficult constitutional
question, namely, the very question that the Court an-
swers today: whether the Commission's administrative
law judges are constitutional "inferior Officers" whose
appointment Congress may vest only in the President, the
"Courts of Law," or the "Heads of Departments." Art. II,
§2, cl. 2; see *United States* v. *Jin Fuey Moy*, 241 U. S. 394,
401 (1916) ("A statute must be construed, if fairly possible,
so as to avoid not only the conclusion that it is unconstitu-
tional but also grave doubts upon that score").

I have found no other statutory provision that would
permit the Commission to delegate the power to appoint
its administrative law judges to its staff. The statute
establishing and governing the Commission does allow the
Commission to "delegate, by published order or rule, any
of its functions to a division of the Commission, an indi-
vidual Commissioner, an administrative law judge, or an
employee or employee board." 15 U. S. C. §78d–1(a). But

this provision requires a "published order or rule," and the Commission here published no relevant delegating order or rule. Rather, Lucia discovered the Commission's appointment system for administrative law judges only when the Commission's enforcement division staff filed an affidavit in this case describing that staff-based system. See App. to Pet. for Cert. 295a–299a. Regardless, the same constitutional-avoidance reasons that should inform our construction of the Administrative Procedure Act should also lead us to interpret the Commission's general delegation authority as excluding the power to delegate to staff the authority to appoint its administrative law judges, so as to avoid the constitutional question the Court reaches in this case. See *Jin Fuey Moy*, *supra,* at 401.

The analysis may differ for other agencies that employ administrative law judges. Each agency's governing statute is different, and some, unlike the Commission's, may allow the delegation of duties without a published order or rule. See, *e.g.,* 42 U. S. C. §902(a)(7) (applicable to the Social Security Administration). Similarly, other agencies' administrative law judges perform distinct functions, and their means of appointment may therefore not raise the constitutional questions that inform my reading of the relevant statutes here.

The upshot, in my view, is that for statutory, not constitutional, reasons, the Commission did not lawfully appoint the Administrative Law Judge here at issue. And this Court should decide no more than that.

## II
### A

The reason why it is important to go no further arises from the holding in a case this Court decided eight years ago, *Free Enterprise Fund, supra.* The case concerned statutory provisions protecting members of the Public Company Accounting Oversight Board from removal

without cause. The Court held in that case that the Executive Vesting Clause of the Constitution, Art. II, §1 ("[t]he executive Power shall be vested in a President of the United States of America"), forbade Congress from providing members of the Board with "multilevel protection from removal" by the President. *Free Enterprise Fund,* 561 U. S., at 484; see *id.,* at 514 ("Congress cannot limit the President's authority" by providing "two levels of protection from removal for those who . . . exercise significant executive power"). But see *id.,* at 514–549 (BREYER, J., dissenting). Because, in the Court's view, the relevant statutes (1) granted the Securities and Exchange Commissioners protection from removal without cause, (2) gave the Commissioners sole authority to remove Board members, and (3) protected Board members from removal without cause, the statutes provided Board members with two levels of protection from removal and consequently violated the Constitution. *Id.,* at 495–498.

In addressing the constitutionality of the Board members' removal protections, the Court emphasized that the Board members were "executive officers"—more specifically, "inferior officers" for purposes of the Appointments Clause. *E.g., id.,* at 492–495, 504–505. The significance of that fact to the Court's analysis is not entirely clear. The Court said:

"The parties here concede that Board members are executive 'Officers', as that term is used in the Constitution. We do not decide the status of other Government employees, nor do we decide whether 'lesser functionaries subordinate to officers of the United States' must be subject to the same sort of control as those who exercise 'significant authority pursuant to the laws.'" *Id.,* at 506 (quoting *Buckley* v. *Valeo*, 424 U. S. 1, 126, and n. 162 (1976) (*per curiam*); citations omitted).

Thus, the Court seemed not only to limit its holding to the Board members themselves, but also to suggest that Government employees who were not officers would be distinguishable from the Board members on that ground alone.

For present purposes, however, the implications of *Free Enterprise Fund*'s technical-sounding holding about "multilevel protection from removal" remain potentially dramatic. 561 U. S., at 484. The same statute, the Administrative Procedure Act, that provides that the "agency" will appoint its administrative law judges also protects the administrative law judges from removal without cause. In particular, the statute says that an

> "action may be taken against an administrative law judge appointed under section 3105 of this title by the agency in which the administrative law judge is employed only for good cause established and determined by the Merit Systems Protection Board on the record after opportunity for hearing before the Board." 5 U. S. C. §7521(a).

As with appointments, this provision constituted an important part of the Administrative Procedure Act when it was originally enacted in 1946. See §11, 60 Stat. 244.

The Administrative Procedure Act thus allows administrative law judges to be removed only "for good cause" found by the Merit Systems Protection Board. §7521(a). And the President may, in turn, remove members of the Merit Systems Protection Board only for "inefficiency, neglect of duty, or malfeasance in office." §1202(d). Thus, Congress seems to have provided administrative law judges with two levels of protection from removal without cause—just what *Free Enterprise Fund* interpreted the Constitution to forbid in the case of the Board members.

The substantial independence that the Administrative Procedure Act's removal protections provide to administrative law judges is a central part of the Act's overall

scheme. See *Ramspeck* v. *Federal Trial Examiners Conference*, 345 U. S. 128, 130 (1953); *Wong Yang Sung* v. *McGrath*, 339 U. S. 33, 46 (1950). Before the Administrative Procedure Act, hearing examiners "were in a dependent status" to their employing agency, with their classification, compensation, and promotion all dependent on how the agency they worked for rated them. *Ramspeck*, 345 U. S., at 130. As a result of that dependence, "[m]any complaints were voiced against the actions of the hearing examiners, it being charged that they were mere tools of the agency concerned and subservient to the agency heads in making their proposed findings of fact and recommendations." *Id.,* at 131. The Administrative Procedure Act responded to those complaints by giving administrative law judges "independence and tenure within the existing Civil Service system." *Id.,* at 132; cf. *Wong Yang Sung*, *supra,* at 41–46 (referring to removal protections as among the Administrative Procedure Act's "safeguards . . . intended to ameliorate" the  perceived "evils" of commingling of adjudicative and prosecutorial functions in agencies).

*If* the *Free Enterprise Fund* Court's holding applies equally to the administrative law judges—and I stress the "if"—then to hold that the administrative law judges are "Officers of the United States" is, *perhaps*, to hold that their removal protections are unconstitutional. This would risk transforming administrative law judges from independent adjudicators into *dependent* decisionmakers, serving at the pleasure of the Commission. Similarly, to apply *Free Enterprise Fund*'s holding to high-level civil servants threatens to change the nature of our merit-based civil service as it has existed from the time of President Chester Alan Arthur. See *Free Enterprise Fund*, 561 U. S., at 540–542 (BREYER, J., dissenting).

I have stressed the words "if" and "perhaps" in the previous paragraph because *Free Enterprise Fund*'s holding may not invalidate the removal protections applicable

to the Commission's administrative law judges even if the judges are inferior "officers of the United States" for purposes of the Appointments Clause. In my dissent in *Free Enterprise Fund*, I pointed out that under the majority's analysis, the removal protections applicable to administrative law judges—including specifically the Commission's administrative law judges—would seem to be unconstitutional. *Id.*, at 542, 587. But the Court disagreed, saying that "none of the positions [my dissent] identifie[d] are similarly situated to the Board." *Id.*, at 506.

The *Free Enterprise Fund* Court gave three reasons why administrative law judges were distinguishable from the Board members at issue in that case. First, the Court said that "[w]hether administrative law judges are necessarily 'Officers of the United States' is disputed." *Id.,* at 507, n. 10. Second, the Court said that "unlike members of the Board, many administrative law judges of course perform adjudicative rather than enforcement or policymaking functions, see [5 U. S. C.] §§554(d), 3105, or possess purely recommendatory powers." *Ibid.* And, third, the Court pointed out that the civil service "employees" and administrative law judges to whom I referred in my dissent do not "enjoy the same significant and unusual protections from Presidential oversight as members of the Board." *Id.,* at 506. The Court added that the kind of "for cause" protection the statutes provided for Board members was "unusually high." *Id.,* at 503.

The majority here removes the first distinction, for it holds that the Commission's administrative law judges are inferior "Officers of the United States." *Ante,* at 1. The other two distinctions remain. See, *e.g., Wiener* v. *United States*, 357 U. S. 349, 355–356 (1958) (holding that Congress is free to protect bodies tasked with "'adjudicat[ing] according to law' . . . 'from the control or coercive influence, direct or indirect,' . . . of either the Executive or Congress") (quoting *Humphrey's Executor* v. *United States*,

295 U. S. 602, 629 (1935)).  But the Solicitor General has nevertheless argued strongly that we should now decide the constitutionality of the administrative law judges' removal protections as well as their means of appointment.  And in his view, the administrative law judges' statutory removal protections violate the Constitution (as interpreted in *Free Enterprise Fund*), unless we construe those protections as giving the Commission substantially greater power to remove administrative law judges than it presently has.  See Merits Brief for Respondent 45–55.

On the Solicitor General's account, for the administrative law judges' removal protections to be constitutional, the Commission itself must have the power to remove administrative law judges "for failure to follow lawful instructions or perform adequately."  *Id.,* at 48.  The Merit Systems Protection Board would then review only the Commission's factfinding, and not whether the facts (as found) count as "good cause" for removal.  *Id.,* at 52–53.  This technical-sounding standard would seem to weaken the administrative law judges' "for cause" removal protections considerably, by permitting the Commission to remove an administrative law judge with whose judgments it disagrees—say, because the judge did not find a securities-law violation where the Commission thought there was one, or vice versa.  In such cases, the law allows the Commission to overrule an administrative law judge's findings, for the decision is ultimately the Commission's.  See 15 U. S. C. §78d–1(b).  But it does not allow the Commission to fire the administrative law judge.  See 5 U. S. C. §7521.

And now it should be clear why the application of *Free Enterprise Fund* to administrative law judges is important.  If that decision does not limit or forbid Congress' statutory "for cause" protections, then a holding that the administrative law judges are "inferior Officers" does not conflict with Congress' intent as revealed in the statute.

But, if the holding is to the contrary, and more particularly if a holding that administrative law judges are "inferior Officers" brings with it application of *Free Enterprise Fund*'s limitation on "for cause" protections from removal, then a determination that administrative law judges are, constitutionally speaking, "inferior Officers" would directly conflict with Congress' intent, as revealed in the statute. In that case, it would be clear to me that Congress did not intend that consequence, and that it therefore did not intend to make administrative law judges "inferior Officers" at all.

### B

Congress' intent on the question matters, in my view, because the Appointments Clause is properly understood to grant Congress a degree of leeway as to whether particular Government workers are officers or instead mere employees not subject to the Appointments Clause. The words "by Law" appear twice in the Clause. It says that the President ("with the Advice and Consent of the Senate") shall appoint "Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, . . . which shall be *established by Law*." Art. II, §2, cl. 2 (emphasis added). It then adds that "Congress may *by Law* vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." *Ibid.* (emphasis added).

The use of the words "by Law" to describe the establishment and means of appointment of "Officers of the United States," together with the fact that Article I of the Constitution vests the legislative power in Congress, suggests that (other than the officers the Constitution specifically lists) Congress, not the Judicial Branch alone, must play a major role in determining who is an "Office[r] of the United States." And Congress' intent in this specific

respect is often highly relevant. Congress' leeway is not, of course, absolute—it may not, for example, say that positions the Constitution itself describes as "Officers" are not "Officers." But given the constitutional language, the Court, when deciding whether other positions are "Officers of the United States" under the Appointments Clause, should give substantial weight to Congress' decision.

How is the Court to decide whether Congress intended that the holder of a particular Government position count as an "Office[r] of the United States"? Congress might, of course, write explicitly into the statute that the employee "is an officer of the United States under the Appointments Clause," but an explicit phrase of this kind is unlikely to appear. If it does not, then I would approach the question like any other difficult question of statutory interpretation. Several considerations, among others, are likely to be relevant. First, as the Court said in *Freytag* v. *Commissioner*, 501 U. S. 868, 881 (1991), and repeats today, *ante,* at 6, where Congress grants an appointee "'significant authority pursuant to the laws to the United States,'" that supports the view that (but should not determinatively decide that) Congress made that appointee an "Office[r] of the United States." *Freytag*, *supra,* at 881 (quoting *Buckley*, 424 U. S., at 126); see also *United States* v. *Germaine*, 99 U. S. 508, 511 (1879) (holding that the term "officer" "embraces the ideas of tenure, duration, emolument, and duties"). The means of appointment that Congress chooses is also instructive. Where Congress provides a method of appointment that mimics a method the Appointments Clause allows for "Officers," that fact too supports the view that (but does not determinatively decide that) Congress viewed the position as one to be held by an "Officer," and vice versa. See *id.*, at 509–511. And the Court's decision in *Free Enterprise Fund* suggests a third indication of "Officer" status—did Congress provide the position with removal protections that would be unconstitutional if

provided for an "Officer"? See 561 U. S., at 514. That fact would support (but again not be determinative of) the opposite view—that Congress did not intend to confer "inferior Officer" status on the position.

As I said, these statutory features, while highly relevant, need not always prove determinative. The vast number of different civil service positions, with different tasks, different needs, and different requirements for independence, mean that this is not the place to lay down bright-line rules. Rather, as this Court has said, "[t]he versatility of circumstances often mocks a natural desire for definitiveness" in this area. *Wiener*, 357 U. S., at 352.

No case from this Court holds that Congress lacks this sort of constitutional leeway in determining whether a particular Government position will be filled by an "Office[r] of the United States." To the contrary, while we have repeatedly addressed whether particular officials are "Officers," in all cases but one, we have upheld the appointment procedures Congress enacted as consistent with the Appointments Clause. See, *e.g., Edmond* v. *United States*, 520 U. S. 651, 666 (1997) (holding that Congress' appointment procedure for military court judges "is in conformity with the Appointments Clause of the Constitution"); *Freytag, supra,* at 888–891 (same as to special trial judges of the Tax Court); *Rice* v. *Ames*, 180 U. S. 371, 378 (1901) (same as to district court "commissioners"); *Ex parte Siebold*, 100 U. S. 371, 397–398 (1880) (same as to "supervisors of election"). But see *Buckley*, *supra,* at 124–137.

The one exception was *Buckley*, 424 U. S., at 124–137, in which the Court set aside Congress' prescribed appointment method for some members of the Federal Election Commission—appointment by Congress itself—as inconsistent with the Appointments Clause. But *Buckley* involved Federal Election Commission members with enormous powers. They had "primary and substantial

responsibility for administering and enforcing the" Federal Election Campaign Act of 1971, *id.*, at 109, an "intricate statutory scheme . . . to regulate federal election campaigns," *id.,* at 12. They had "extensive rulemaking and adjudicative powers," *id.,* at 110; the power to enforce the law through civil lawsuits, *id.,* at 111; and the power to disqualify a candidate from running for federal office, *id.,* at 112–113. Federal Election Commissioners thus had powers akin to the "principal Officer[s]" of an Executive Department, whom the Constitution expressly refers to as "Officers," see Art. II, §2, cl. 1. It is not surprising that Congress exceeded any leeway the Appointments Clause granted when it deviated from the Clause's appointments' methods in respect to an office with powers very similar to those of the Officers listed in the Constitution itself.

Thus, neither *Buckley* nor any other case forecloses an interpretation of the Appointments Clause that focuses principally on whether the relevant statutes show that Congress intended that a particular Government position be held by an "Office[r] of the United States." Adopting such an approach, I would not answer the question whether the Securities and Exchange Commission's administrative law judges are constitutional "Officers" without first deciding the pre-existing *Free Enterprise Fund* question— namely, what effect that holding would have on the statutory "for cause" removal protections that Congress provided for administrative law judges. If, for example, *Free Enterprise Fund* means that saying administrative law judges are "inferior Officers" will cause them to lose their "for cause" removal protections, then I would likely hold that the administrative law judges are not "Officers," for to say otherwise would be to contradict Congress' enactment of those protections in the Administrative Procedure Act. In contrast, if *Free Enterprise Fund* does not mean that an administrative law judge (if an "Office[r] of the United States") would lose "for cause" protections, then it is more

likely that interpreting the Administrative Procedure Act as conferring such status would not run contrary to Congress' intent. In such a case, I would more likely hold that, given the other features of the Administrative Procedure Act, Congress did intend to make administrative law judges inferior "Officers of the United States."

### III

Separately, I also disagree with the majority's conclusion that the proper remedy in this case requires a hearing before a *different* administrative law judge. *Ante,* at 12–13. The Securities and Exchange Commission has now itself appointed the Administrative Law Judge in question, and I see no reason why he could not rehear the case. After all, when a judge is reversed on appeal and a new trial ordered, typically the judge who rehears the case is the same judge who heard it the first time. The reversal here is based on a technical constitutional question, and the reversal implies no criticism at all of the original judge or his ability to conduct the new proceedings. For him to preside once again would not violate the structural purposes that we have said the Appointments Clause serves, see *Freytag*, 501 U. S., at 878, nor would it, in any obvious way, violate the Due Process Clause.

Regardless, this matter was not addressed below and has not been fully argued here. I would, at a minimum, ask the Court of Appeals to examine it on remand rather than decide it here now. That is especially so because the majority seems to state a general rule that a different "Officer" must *always* preside after an Appointments Clause violation. In a case like this one, that is a relatively minor imposition, because the Commission has other administrative law judges. But in other cases—say, a case adjudicated by an improperly appointed (but since reappointed) Commission itself—the "Officer" in question may be the *only* such "Officer," so that no substitute will be

available. The majority suggests that in such cases, the "rule of necessity" may excuse compliance with its new-found different-"Officer" requirement. *Ante,* at 12–13, n. 5. But that still does not explain why the Constitution would require a hearing before a different "Officer" at all.

\*     \*     \*

The Court's decision to address the Appointments Clause question separately from the constitutional removal question is problematic. By considering each question in isolation, the Court risks (should the Court later extend *Free Enterprise Fund*) unraveling, step-by-step, the foundations of the Federal Government's administrative adjudication system as it has existed for decades, and perhaps of the merit-based civil-service system in general. And the Court risks doing so without considering that potential consequence. For these reasons, I concur in the judgment in part and, with respect, I dissent in part.

# SUPREME COURT OF THE UNITED STATES

_____

No. 17–130

_____

## RAYMOND J. LUCIA, ET AL., PETITIONERS *v.* SECURITIES AND EXCHANGE COMMISSION

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[June 21, 2018]

JUSTICE SOTOMAYOR, with whom JUSTICE GINSBURG joins, dissenting.

The Court today and scholars acknowledge that this Court's Appointments Clause jurisprudence offers little guidance on who qualifies as an "Officer of the United States." See, *e.g., ante,* at 6 ("The standard is no doubt framed in general terms, tempting advocates to add whatever glosses best suit their arguments"); Plecnik, Officers Under the Appointments Clause, 11 Pitt. Tax Rev. 201, 204 (2014). The lack of guidance is not without consequence. "[Q]uestions about the Clause continue to arise regularly both in the operation of the Executive Branch and in proposed legislation." 31 Opinion of Office of Legal Counsel 73, 76 (2007) (Op. OLC). This confusion can undermine the reliability and finality of proceedings and result in wasted resources. See *ante,* at 12–13 (opinion of the Court) (ordering the Commission to grant petitioners a new administrative hearing).

As the majority notes, see *ante,* at 5–6, this Court's decisions currently set forth at least two prerequisites to officer status: (1) an individual must hold a "continuing" office established by law, *United States* v. *Germaine*, 99 U. S. 508, 511–512 (1879), and (2) an individual must wield "significant authority," *Buckley* v. *Valeo*, 424 U. S. 1, 126 (1976) (*per curiam*). The first requirement is relatively

easy to grasp; the second, less so.  To be sure, to exercise "significant authority," the person must wield considerable powers in comparison to the average person who works for the Federal Government.  As this Court has noted, the vast majority of those who work for the Federal Government are not "Officers of the United States."  See *Free Enterprise Fund* v. *Public Company Accounting Oversight Bd.*, 561 U. S. 477, 506, n. 9 (2010) (indicating that well over 90% of those who render services to the Federal Government and are paid by it are not constitutional officers).  But this Court's decisions have yet to articulate the types of powers that will be deemed significant enough to constitute "significant authority."

To provide guidance to Congress and the Executive Branch, I would hold that one requisite component of "significant authority" is the ability to make final, binding decisions on behalf of the Government.  Accordingly, a person who merely advises and provides recommendations to an officer would not herself qualify as an officer.

There is some historical support for such a requirement.  For example, in 1822, the Supreme Judicial Court of Maine opined in the "fullest early explication" of the meaning of an "'office,'" that "'the term "office" implies a delegation of a portion of the sovereign power to, and possession of it by the person filling the office,'" that "'in its effects[,] . . . will bind the rights of others.'"  31 Op. OLC 83 (quoting 3 Greenl. (Me.) 481, 482).  In 1899, a Report of the Judiciary Committee of the House of Representatives noted that "the creation and conferring of an office involves a delegation to the individual of . . . sovereign functions," *i.e.,* "the power to . . . legislate, . . . execute law, or . . . hear and determine judicially questions submitted."  1 A. Hinds, Precedents of the House of Representatives of the United States 607 (1907).  Those who merely assist others in exercising sovereign functions but who do not have the authority to exercise sovereign pow-

ers themselves do not wield significant authority. *Id.,* at
607–608. Consequently, a person who possesses the "mere
power to investigate some particular subject and report
thereon" or to engage in negotiations "without [the] power
to make binding" commitments on behalf of the Govern-
ment is not an officer. *Ibid.*

Confirming that final decisionmaking authority is a
prerequisite to officer status would go a long way to aiding
Congress and the Executive Branch in sorting out who is
an officer and who is a mere employee. At the threshold,
Congress and the Executive Branch could rule out as an
officer any person who investigates, advises, or recom-
mends, but who has no power to issue binding policies,
execute the laws, or finally resolve adjudicatory questions.

Turning to the question presented here, it is true that
the administrative law judges (ALJs) of the Securities and
Exchange Commission wield "extensive powers." *Ante,* at
2. They preside over adversarial proceedings that can lead
to the imposition of significant penalties on private par-
ties. See *ante,* at 2–3 (noting that the proceedings in the
present case resulted in the imposition of $300,000 in civil
penalties, as well as a lifetime bar from the investment
industry). In the hearings over which they preside, Com-
mission ALJs also exercise discretion with respect to
important matters. See *ante,* at 2 (discussing Commission
ALJs' powers to supervise discovery, issue subpoenas, rule
on the admissibility of evidence, hear and examine wit-
nesses, and regulate the course of the proceedings).

Nevertheless, I would hold that Commission ALJs are
not officers because they lack final decisionmaking author-
ity. As the Commission explained below, the Commission
retains "'plenary authority over the course of [its] admin-
istrative proceedings and the rulings of [its] law judges.'"
*In re Raymond J. Lucia Companies, Inc. & Raymond J.
Lucia, Sr.*, SEC Release No. 75837 (Sept. 3, 2015). Com-
mission ALJs can issue only "initial" decisions. 5 U. S. C.

§557(b). The Commission can review any initial decision upon petition or on its own initiative. 15 U. S. C. §78d–1(b). The Commission's review of an ALJ's initial decision is *de novo.* 5 U. S. C. §557(c). It can "make any findings or conclusions that in its judgment are proper and on the basis of the record." 17 CFR §201.411(a) (2017). The Commission is also in no way confined by the record initially developed by an ALJ. The Commission can accept evidence itself or refer a matter to an ALJ to take additional evidence that the Commission deems relevant or necessary. See *ibid.*; §201.452. In recent years, the Commission has accepted review in every case in which it was sought. See R. Jackson, Fact and Fiction: The SEC's Oversight of Administrative Law Judges (Mar. 9, 2018), http://clsbluesky.law.columbia.edu/2018/03/09/fact-and-fiction-the-secs-oversight-of-administrative-law-judges/ (as last visited June 19, 2018). Even where the Commission does not review an ALJ's initial decision, as in cases in which no party petitions for review and the Commission does not act *sua sponte*, the initial decision still only becomes final when the Commission enters a finality order. 17 CFR. §201.360(d)(2). And by operation of law, every action taken by an ALJ "shall, for all purposes, . . . be deemed the action of the *Commission*." 15 U. S. C. §78d–1(c) (emphasis added). In other words, Commission ALJs do not exercise significant authority because they do not, and cannot, enter final, binding decisions against the Government or third parties.

The majority concludes that this case is controlled by *Freytag* v. *Commissioner*, 501 U. S. 868 (1991). See *ante,* at 6. In *Freytag*, the Court suggested that the Tax Court's special trial judges (STJs) acted as constitutional officers even in cases where they could not enter final, binding decisions. In such cases, the Court noted, the STJs presided over adversarial proceedings in which they exercised "significant discretion" with respect to "important func-

tions," such as ruling on the admissibility of evidence and hearing and examining witnesses. 501 U. S*., at 881–882. That part of the opinion, however, was unnecessary to the result. The Court went on to conclude that even if the STJs' duties in such cases were "not as significant as [the Court] found them to be," its conclusion "would be unchanged." *Id.,* at 882. The Court noted that STJs could enter final decisions in certain types of cases, and that the Government had conceded that the STJs acted as officers with respect to those proceedings. *Ibid.* Because STJs could not be "officers for purposes of some of their duties . . . , but mere employees with respect to other[s]," the Court held they were officers in all respects. *Ibid. Freytag* is, therefore, consistent with a rule that a prerequisite to officer status is the authority, in at least some instances, to issue final decisions that bind the Government or third parties.*

Because I would conclude that Commission ALJs are not officers for purposes of the Appointments Clause, it is not necessary to reach the constitutionality of their removal protections. See *ante,* at 1 (BREYER, J., concurring in judgment in part and dissenting in part). In any event, for at least the reasons stated in JUSTICE BREYER's opinion, *Free Enterprise Fund* is readily distinguishable from the circumstances at play here. See *ante,* at 3–9.

As a final matter, although I would conclude that Commission ALJs are not officers, I share JUSTICE BREYER's concerns regarding the Court's choice of remedy, and so I join Part III of his opinion.

For the foregoing reasons, I respectfully dissent.

———————

\*Even the majority opinion is not inconsistent with such a rule, in that it appears to conclude, wrongly in my view, that Commission ALJs can at times render final decisions. See *ante,* at 10.