(Slip Opinion)

# Mandatory Disclosure of Civil Rights Cold Case Records

The mandatory disclosure regime in S. 3191, the Civil Rights Cold Case Records Collection Act of 2018, could curtail the President's ability to protect information subject to executive privilege.

S. 3191 unconstitutionality restricts the qualifications for appointees to the Civil Rights Cold Case Records Review Board and unconstitutionally dictates the timing of their appointments.

S. 3191 unconstitutionally restricts the President's supervision of the Executive Branch by prohibiting the President from removing Review Board members absent cause.

February 4, 2019

MEMORANDUM OPINION FOR THE
DEPUTY COUNSEL TO THE PRESIDENT

On December 27, 2018, Congress presented S. 3191, the Civil Rights Cold Case Records Collection Act of 2018, to the President as an enrolled bill. Relying on advice from this Office, the Department of Justice had raised serious constitutional concerns about earlier versions of this bill.[1] Congress alleviated some of those concerns, but major issues remained in the enrolled version. When confronted with legislation presenting similar problems, Presidents have historically issued signing statements to explain why the Executive believes certain provisions would violate the Constitution and how the President would interpret or implement provisions to avoid constitutional infirmities. Consistent with this Office's advice, when the President signed this bill into law on January 8, 2019, he issued a signing statement indicating how the Administration would interpret and apply the Act in a manner consistent with the Constitution. *See* Statement by the President (Jan. 8, 2019), https://www.whitehouse.gov/briefings-statements/statement-by-the-president-24/ ("2019 Signing Statement"); Civil Rights Cold Case Rec-

---

[1] *See* Letter for Ron Johnson, Chairman, Committee on Homeland Security and Governmental Affairs, U.S. Senate, from Prim F. Escalona, Principal Deputy Assistant Attorney General, Office of Legislative Affairs, Dep't of Justice (Nov. 13, 2018); Letter for Trey Gowdy, Chairman, Committee on Oversight and Government Reform, U.S. House of Representatives, from Prim F. Escalona, Principal Deputy Assistant Attorney General, Office of Legislative Affairs, Dep't of Justice (Nov. 13, 2018).

ords Collection Act of 2018, Pub. L. No. 115-426, 132 Stat. 5489 (2019). This memorandum explains the basis for our advice.

Congress appears to have modeled this legislation after the President John F. Kennedy Assassination Records Collection Act of 1992, Pub. L. No. 102-526, 106 Stat. 3443 ("JFK Act"). The JFK Act created an independent agency—the Assassination Records Review Board—charged with determining whether to require the public disclosure of records related to President Kennedy's assassination. When President George H.W. Bush signed that bill into law, he noted that he "fully support[ed] the goals of this legislation." Statement on Signing the President John F. Kennedy Assassination Records Collection Act of 1992 (Oct. 26, 1992), 2 Pub. Papers of Pres. George Bush 2004, 2004 (1992–93) ("1992 Signing Statement"). But his signing statement also explained that the JFK Act's mandatory disclosure regime encroached upon the President's control over information subject to executive privilege—a constitutional authority that "cannot be limited by statute"—and had to be interpreted in a manner consistent with the President's constitutional authority. *Id*. at 2004–05. President Bush observed that the JFK Act also presented other significant separation of powers concerns. *Id*. at 2005.

S. 3191 replicates, and in some instances exacerbates, the constitutional infirmities of the JFK Act. It creates an independent agency—the Civil Rights Cold Case Records Review Board ("Review Board")—and tasks it with publicly releasing all records relating to unsolved civil rights cases unless clear and convincing evidence establishes that disclosure would pose a concrete threat to national security, foreign affairs, law enforcement, or certain privacy interests. As under the JFK Act, this mandatory disclosure regime could curtail the President's ability to protect information subject to executive privilege. In his signing statement, the President explained that, although he "fully support[s] the goals of this Act," he "cannot abdicate [his] constitutional responsibility to protect such information when necessary." 2019 Signing Statement. He thus signed the Act "on the understanding that the public disclosure of records may be postponed where necessary to protect executive privilege" and explained that he would interpret the Act "consistent with [his] authority under the Constitution to protect confidential executive branch materials." *Id*.

This legislation also trenches upon the constitutional separation of powers in other ways. The Appointments Clause, U.S. Const. art. II, § 2, cl. 2, gives the President broad discretion when appointing principal

officers, but the Act unconstitutionally restricts the qualifications for Review Board appointees and impermissibly dictates the timing of future appointments. The President's signing statement indicated that he "will make every effort to heed" those restrictions, "but, consistent with [his] constitutional authorities," will treat those restrictions as advisory. Finally, the Act purports to restrict the President's ability to supervise principal officers performing sensitive executive functions, by insulating the Review Board members from removal except for cause. Because Congress cannot constitutionally "insulate decisionmakers who exercise core executive functions from plenary presidential supervision," the President stated that he "will, therefore, comply with these removal restrictions only insofar as they comport with [his] constitutional responsibility to supervise the executive branch." 2019 Signing Statement.

## I.

This legislation establishes a new "independent agency," the Civil Rights Cold Case Records Review Board, and vests it with broad powers to decide whether to direct the public release of "civil rights cold case records." S. 3191, § 5. The Review Board has jurisdiction over a potentially wide range of materials, because such records include all records of any "civil rights cold case," defined as "any unsolved case" arising from events between January 1, 1940 and December 31, 1979, "related to" certain federal civil rights statutes—namely 18 U.S.C. § 241 (conspiracy against rights), 18 U.S.C. § 242 (deprivation of rights under color of law), 18 U.S.C. § 245 (federally protected activities), 18 U.S.C. §§ 1581 and 1584 (peonage and involuntary servitude), 42 U.S.C. § 3631 (criminal interference with housing-related rights), and any other federal law in effect by December 31, 1979 that is enforced by the criminal section of the Department of Justice's Civil Rights Division. S. 3191, § 2(2). Cold case records also include any records "related to a civil rights cold case." *Id*. § 2(3)(A). Because of the breadth of the phrase "related to," such cases need not involve violations of those statutes. Further, cold case records extend well beyond files created during any investigation of such cases, and could encompass materials created long after 1979.[2]

---

[2] The Assassination Records Review Board interpreted the analogous phrase "relate to the assassination of President John F. Kennedy" in the definition of an "assassination record," JFK Act § 3(2), 106 Stat. at 3444, to encompass records generated in the 1990s

The Review Board also has the power to decide whether to order the public disclosure of records from all three branches of government, because civil rights cold case records encompass any relevant material that any branch of government originated or possessed. The definition of a "civil rights cold case record" under the Act includes records "created or made available for use by, obtained by, or [which] otherwise came into the possession of" all executive agencies, independent agencies, and "any other entity of the Federal Government." S. 3191, § 2(3)(B); *see id.* § 2(6) (defining "Government office" to include "any office of the Federal Government" holding cold case records); *id.* § 2(10) (defining "originating body" to include executive agencies, congressional committees, and any "other Governmental entity that created a record"); *id.* § 7(c)(5) (contemplating that records from outside the Executive Branch qualify as cold case records).[3]

To make these disclosure decisions, the Review Board has five members, whom the President must appoint subject to the advice and consent of the Senate. *Id.* § 5(b)(1). Though the President chooses nominees, the Act purports to confine his choice to individuals satisfying numerous qualifications, including never having been involved in any investigation or inquiry related to any civil rights cold case. *Id*. § 5(b)(2)(B), (3). The Act also directs that, "so far as practicable," appointments should occur within 60 days of enactment. *Id*. § 5(b)(2)(A). Appointment of a replacement must occur "in the same manner as the original appointment within 60 days of the occurrence of the vacancy." *Id*. § 5(d). Thus, in the event of a vacancy, the Act purports not only to impose the same qualifications on nominees, but also to require that the entire process, from the initial selection to Senate confirmation and presidential appointment, occur within 60 days.

Once constituted, the Review Board has four years to operate, but can add another year at its discretion to complete its work. *Id*. § 5(n)(1). The

---

pertaining to investigations or inquiries into the assassination. *Temporary Certification Under the President John F. Kennedy Assassination Records Collection Act of 1992*, 41 Op. O.L.C. __, at *3 (Oct. 26, 2017).

[3] The bill does not appear to subject grand jury materials or other sealed materials that otherwise qualify as cold case records to the mandatory disclosure procedures. Rather, the bill authorizes the Review Board to "request the Attorney General to petition any court in the United States" to release such records, and requires the Attorney General to respond to such a request within 45 days. S. 3191, § 8(a)(1), (2)(A), (3)(A).

Act authorizes the President to remove Review Board members from office only for cause: "inefficiency, neglect of duty, malfeasance in office, physical disability, mental incapacity, or any other condition that substantially impairs the performance of the member's duties." *Id*. § 5(f)(1)(B). And the President must notify Congress of the justification for any removal within ten days. *Id*. § 5(f)(2)(A). A member who is removed can seek review in the U.S. District Court for the District of Columbia. *Id*. § 5(f)(3).

The records review process will work as follows: Within two years of the Act's enactment, every relevant entity within the federal government—whether in the Executive, Legislative, or Judicial Branch—must identify all cold case records in its possession and decide whether to publicly disclose them. If the entity determines that a record can be publicly disclosed, it must transmit the record to the Archivist of the United States, *id*. § 3(e)(1)(A), who must make the record publicly available within 60 days, *id*. § 3(b).

The Act authorizes postponement of disclosure in only two circumstances. First, the Attorney General can temporarily delay transmitting records to the Archivist by certifying within two years of the Act's enactment that he "intends to reopen and pursue prosecution of the civil rights cold case to which a civil rights cold case record relates." *Id*. § 3(e)(2). That certification gives the Attorney General one year to file an indictment or information; if he fails to do so, he must then transmit the records to the Archivist. *Id*. § 3(e)(2)(B). If he pursues the case, he may delay transmitting records to the Archivist until 90 days after either "final judgment is entered in the proceedings relating to" the cold case or such proceedings were "dismissed with prejudice." *Id*. § 3(e)(2)(A). The Act does not include any mechanism for requesting further delay on another basis after this temporary postponement ends, even if the case is under active investigation at that point. It is also unclear whether the Attorney General can seek Review Board approval of further postponement at that juncture.

Second, within two years of the Act's enactment, any governmental entity with a cold case record can seek the Review Board's approval to postpone disclosure. *See id*. §§ 3(e)(1)(B), 5(h), 5(i)(1)(A). But the Review Board must order public disclosure absent "clear and convincing evidence" that the record is "not a civil rights cold case record" or that it qualifies for postponement under one of the narrow exceptions in sec-

tion 4 of the Act. *Id*. § 7(c)(1).[4] Even if the Review Board determines that postponement is warranted, it must designate a recommended specific time or occurrence "following which the material may be appropriately disclosed to the public." *Id*. § 7(c)(3)(B).

Once the Review Board decides whether to postpone or withhold "executive branch civil rights cold case record[s] or information," the President has "sole and nondelegable authority to require the disclosure or postponement of such record or information" and "shall" notify the Review Board of his determination "within 30 days." *Id*. § 7(d)(1). Further, the Act purports to limit the President's postponement power by authorizing him to override the Review Board's determination only if he finds that the record satisfies the section 4 postponement criteria. *Id*. The Review Board's decisions as to records originating in or received by the Legislative or Judicial Branches are final; representatives of those branches have no similar means to override decisions mandating the disclosure of their records.

Postponed records—including those the President orders postponed—undergo periodic further review. *Id.* §§ 3(f ), 7(d)(2). The Archivist and the governmental entity that created the record must review every postponed record annually, "consistent with the recommendations of the Review Board" regarding circumstances warranting future disclosure. *Id*. § 3(f )(1). The Act does not specify a mechanism for the President or anyone else to review these decisions.

---

[4] Section 4 authorizes postponement only if disclosure "would clearly and demonstrably be expected to" (1) reveal certain classified information or "cause identifiable or describable damage to national security, military defense, law enforcement, intelligence operations, or the conduct of foreign relations that is of such gravity that it outweighs the public interest in disclosure"; (2) reveal a living confidential informant and "pose a substantial risk of harm to that individual"; (3) "constitute an unwarranted invasion of personal privacy"; (4) compromise a confidentiality understanding with a cooperating individual, such that the harm of disclosure would outweigh the public interest; (5) "endanger the life or physical safety of any individual"; or (6) "interfere with ongoing law enforcement proceedings." The bill elsewhere states that the Review Board "shall consider[] . . . relevant laws and policies protecting criminal records of juveniles," in addition to the section 4 criteria. S. 3191, § 7(c)(1)(B). But it is unclear whether government entities can recommend postponement on this basis, *see id*. § 4, and the bill does not authorize the President to reverse the Review Board's determination when it has inadequately considered such laws or policies, *id*. § 7(d)(1) (requiring the President to apply "the standards set forth in section 4").

Finally, the Act mandates disclosure of all postponed records in 25 years unless disclosure (1) would "cause identifiable or describable damage to national security, military defense, law enforcement, intelligence operations, or the conduct of foreign relations that is of such gravity that it outweighs the public interest in disclosure" or (2) would reveal certain classified information. *Id.* § 3(f)(4)(A)(i). A governmental entity can recommend postponing disclosure beyond 25 years only if it makes the case, in writing, as to why its record satisfies those criteria. Even then, the Archivist must "agree[] with the written recommendation" for postponement to continue. *Id*. § 3(f)(4)(A)(iii).

## II.

In various applications, this legislation purports to impermissibly restrict the President's exercise of his constitutional authority to control the disclosure of information protected by executive privilege. S. 3191 contains various grounds for postponing the disclosure of cold case records, and in many instances those grounds may allow governmental entities to protect information subject to executive privilege. But the criteria for postponement do not appear to encompass the gamut of privileged information and erect significant obstacles to its protection. Furthermore, the Act purports to unconstitutionally dictate the disclosure of privileged information within the Executive Branch and to Congress.

The President's obligation to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, requires him to interpret and implement statutes in a constitutional manner. *See Presidential Signing Statements*, 31 Op. O.L.C. 23, 27 (2007); *Presidential Authority to Decline to Execute Unconstitutional Statutes*, 18 Op. O.L.C. 199, 202 (1994). Faced with legislation raising similar constitutional problems, Presidents have frequently issued signing statements indicating that the Executive will treat as advisory provisions that purport to mandate the disclosure of privileged information. *See, e.g.*, *Presidential Signing Statements*, 31 Op. O.L.C. at 33–34. Indeed, President Bush's signing statement regarding similar provisions of the JFK Act explained that because Congress cannot limit the President's constitutional authority to protect privileged information, the President would protect such information "when necessary" and would interpret relevant provisions "consistently with [his] authority under the Constitution to protect confidential executive branch materials."

1992 Signing Statement at 2004–05.[5] We accordingly advised that the President should notify Congress and the public that he would treat similar provisions in S. 3191 the same way.

## A.

We start with the constitutional concerns arising from the Act's mandatory disclosure regime. The President's authority "to prevent disclosure of certain Executive Branch documents under the doctrine of executive privilege" is "fundamental to the President's ability to carry out his constitutionally prescribed duties." *Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 Op. O.L.C. 101, 116 (1984) ("*Contempt of Congress*"). "[I]n order for the President to carry out his constitutional responsibility to enforce the laws, he must be able to protect the confidentiality of certain types of documents and communications within the Executive Branch." *Id*. at 115; *see also Congressional Requests for Confidential Executive Branch Information*, 13 Op. O.L.C. 153, 154 (1989) ("*Congressional Requests*") (executive privilege "is a necessary corollary of the executive function vested in the President by Article II of the Constitution"). The Supreme Court has thus recognized that executive privilege is "fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution." *United States v. Nixon*, 418 U.S. 683, 708 (1974).

Although there is no "absolute, unqualified Presidential privilege" to prevent the disclosure of all privileged information, *id*. at 706, the privileged information at issue falls in the heartland of information that the Executive Branch must be able to protect to perform its constitutionally assigned functions. "Opinions by Attorneys General and this Office have repeatedly recognized the President's authority and respon-

---

[5] *See also, e.g*., Statement on Signing the Consolidated Appropriations Act, 2017 (May 5, 2017), 2017 Daily Comp. Pres. Doc. No. 312, at 2 (May 5, 2017); Statement on Signing the Omnibus Appropriations Act, 2009 (Mar. 11, 2009), 1 Pub. Papers of Pres. Barack Obama 216, 216–17 (2009); Statement on Signing the E-Government Act of 2002 (Dec. 17, 2002), 2 Pub. Papers of Pres. George W. Bush 2200, 2201 (2002); Statement on Signing the Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999 (Oct. 23, 1998), 2 Pub. Papers of William J. Clinton 1843, 1848 (1998); Statement on Signing the Foreign Relations Authorization Act, Fiscal Years 1992 and 1993 (Oct. 28, 1991), 2 Pub. Papers of Pres. George Bush 1344, 1345–46 (1991).

sibility to protect against the release of information affecting the Executive Branch's intelligence activities, military operations, conduct of foreign affairs, or law enforcement proceedings, even in the face of statutory disclosure requirements." *Temporary Certification Under the President John F. Kennedy Assassination Records Collection Act of 1992*, 41 Op. O.L.C. __, at *16 (Oct. 26, 2017) ("*Temporary Certification*"); *see id.* at *16–18; *In re Sealed Case*, 121 F.3d 729, 736–39 (D.C. Cir. 1997). S. 3191, however, purports to cabin the President's authority by imposing statutory criteria that could subject large swaths of privileged information to mandatory disclosure during the initial review process. And provisions concerning successive rounds of review and disclosure of remaining records 25 years after the Act's enactment could jeopardize protection even for privileged records that satisfy the initial postponement criteria.

With respect to initial disclosure determinations, the Act will protect privileged information only based on "clear and convincing evidence" that a record satisfies one of the statutory grounds for postponement in section 4. S. 3191, § 7(c)(1). But the President cannot lose the constitutional prerogative of asserting executive privilege merely because an agency fails to satisfy a burden of proof that exceeds the standard in most civil cases. Such a regime could impermissibly compel the disclosure of privileged records irrespective of how greatly their disclosure would interfere with Executive Branch functions.

Furthermore, no matter what the standard of proof, the Act purports to disable the President from protecting an array of privileged information that may not fit within the narrow statutory grounds in section 4. For example, the deliberative process component of executive privilege encompasses "'advisory opinions, recommendations and deliberations comprising part of a process by which government decisions and policies are formulated'"—materials often found in investigative files. *Dep't of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001) (quoting *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975)). Such files may also contain "'communications between high Government officials and those who advise and assist them in the performance of their manifold duties,'" which also fall within the scope of the privilege. *Assertion of Executive Privilege with Respect to Clemency Decision*, 23 Op. O.L.C. 1, 2 (1999) (opinion of Attorney General Janet Reno) (quoting *United States v. Nixon*, 418 U.S. at 705). As the Supreme

Court has explained, "the valid need for protection" of such communications is "too plain to require further discussion." *United States v. Nixon*, 418 U.S. at 705. Yet section 4 of the Act contains no express mechanism for protecting information on that basis. The JFK Act similarly failed to "contemplate nondisclosure of Executive Branch deliberations," prompting President Bush to explain that he could not "abdicate [his] constitutional responsibility" to postpone records containing such deliberative information "when necessary." 1992 Signing Statement at 2004.

The section 4 postponement criteria could also inadequately protect records subject to the law enforcement component of executive privilege, which gives the President the discretion to withhold investigative files, whether open or closed, from disclosure. *See generally Assertion of Executive Privilege Concerning Special Counsel's Interviews*, 32 Op. O.L.C. 7, 10–11 (2008).[6] As Attorney General William French Smith explained, "[i]f the President believes that certain types of information in law enforcement files are sufficiently sensitive that they should be kept confidential, it is the President's constitutionally required obligation to make that determination." *Assertion of Executive Privilege in Response to Congressional Demands for Law Enforcement Files*, 6 Op. O.L.C. 31, 35 (1982); *see also Temporary Certification*, 41 Op. O.L.C. __, at *16; *Response to Congressional Requests for Information Regarding Decisions Made Under the Independent Counsel Act*, 10 Op. O.L.C. 68, 75–78 (1986) ("*Response to Congressional Requests*").

Investigative files often contain factual information that could, if disclosed, compromise an investigation or prosecution, reveal sensitive investigative techniques, or endanger confidential sources. Such files may also contain strategic information about the Department of Justice's plans for investigating and prosecuting a case. *See Position of the Executive Department Regarding Investigative Reports*, 40 Op. Att'y Gen. 45, 46 (1941) (opinion of Attorney General Robert Jackson) ("Counsel for a

---

[6] *See also Contempt of Congress*, 8 Op. O.L.C. at 117–18 ("[T]he Executive's ability to enforce the law would be seriously impaired . . . if the Executive were forced to disclose sensitive information on case investigations and strategy from open enforcement files."); *Response to Congressional Requests*, 10 Op. O.L.C. at 77 ("Obviously, much of the information in a closed criminal enforcement file, such as unpublished details of allegations against particular individuals and details that would reveal confidential sources, and investigative techniques and methods, would continue to need protection[.]").

defendant or prospective defendant[] could have no greater help than to know how much or how little information the Government has, and what witnesses or sources of information it can rely upon."); *cf. United States v. Agurs*, 427 U.S. 97, 108–13 (1976) (prosecutors are constitutionally obligated to disclose material favorable evidence if nondisclosure would deny defendant a fair trial, but "there is no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work") (internal quotation marks omitted). While not every cold case record may contain such sensitive information—let alone information that remains sensitive today—the President must retain the ability to withhold such records when disclosure would interfere with his constitutional responsibility to enforce the law. As President Bush emphasized when objecting to similar provisions in the JFK Act, the President's "authority to protect" information subject to executive privilege "comes from the Constitution and cannot be limited by statute." 1992 Signing Statement at 2004.

The Act, however, purports to replace the President's judgment about the sensitivity of law enforcement files with statutory grounds for withholding law enforcement records. The phrase "cold case records" refers to all records "related to" "unsolved" criminal cases "related to" alleged violations of certain civil rights statutes between 1940 and 1980—cases that may never have been closed and may still be under active investigation. S. 3191, § 2(2), 2(3)(A).[7] Yet the Act allows agencies to withhold investigative files only if disclosure would (1) "cause identifiable or describable damage to . . . law enforcement . . . of such gravity that it outweighs the public interest in disclosure," *id*. § 4(1)(A); (2) reveal the identity of living confidential sources *and* "pose a substantial risk of harm to that person," *id*. § 4(2); (3) "compromise the existence of an understanding of confidentiality" with a cooperating individual *and* "be so harmful that the understanding of confidentiality outweighs the public

---

[7] While courts have recognized that the common-law law enforcement privilege does not extend indefinitely, it usually expires "at the close of an investigation or at a reasonable time thereafter based on a particularized assessment of the document." *In re U.S. Dep't of Homeland Security*, 459 F.3d 565, 571 (5th Cir. 2006). Many cold case records, however, may involve open investigations, and this Office has long recognized that the law enforcement component of executive privilege can extend to closed files as well. *See supra* p. 10.

interest," *id*. § 4(4); or (4) "interfere with ongoing law enforcement proceedings," *id*. § 4(6).

These statutory exceptions could curtail the President's ability to safeguard privileged information even when disclosure could jeopardize important law enforcement interests. For example, cold case records may contain information that investigators withheld in order to test the veracity of confessions. But unless disclosure of such information would cause "identifiable or describable damage" to law enforcement "of such gravity that it outweighs the public interest in disclosure," the Act appears to require public disclosure. Furthermore, the Act could require the government to reveal the identities of its confidential sources even if there were some risk they would face harm, so long as the risk would not be "substantial." Likewise, the Act arguably compels the disclosure of confidential cooperation—even ongoing cooperation—if the harm from disclosure would not outweigh the public interest in disclosure. But the law enforcement component of executive privilege protects such information against public disclosure based on whether disclosure would "discourag[e] citizens from giving the government information," among other considerations. *Temporary Certification*, 41 Op. O.L.C. __, at *13–14 n.7 (internal quotation marks and citations omitted). While the Act authorizes withholding if disclosure would "interfere with ongoing law enforcement proceedings," it is unclear whether that would cover interference with investigative steps preceding an indictment or the convening of a grand jury, especially if the investigation were inactive at the time of review.

Compounding these concerns, the Act could handcuff the Attorney General in prosecuting cold cases for which the statute of limitations has not expired. The Attorney General has only two years from enactment to certify that he is temporarily delaying the transmission of records to the Archivist in a cold case he may wish to reopen and prosecute. S. 3191, § 3(e)(2). But other agencies with cold case records potentially relevant to any prosecution face the same two-year window to decide whether to disclose those records. *Id*. § 3(e)(1). This provision could artificially constrain the Attorney General's decisions about whether to reopen cold cases, lest governmental entities outside the Executive Branch beat him to the punch and publicly disclose records that would thwart any future prosecution. Even if the Attorney General makes the requisite certification to protect such records, the Act mandates their transmission to the Archivist within one year, unless the Attorney General has brought charg-

es by then. *Id.* § 3(e)(2). And the Act does not clearly provide for postponement of public disclosure after transmission, especially if the Review Board has terminated by that point. In other words, the Attorney General could certify that he plans to reopen a case based on a new lead, but if an indictment or information takes longer than a year to file, any new and highly sensitive information could, perversely, become more vulnerable to disclosure because of the certification.

The Act could also intrude on the President's control over information relating to national security and foreign relations, which involve core aspects of executive privilege. The President's "authority to classify and control access to information bearing on national security . . . flows primarily from th[e] constitutional investment of [the Commander in Chief ] power in the President," and the "authority to protect such information falls on the President as head of the Executive Branch and as Commander in Chief." *Dep't of the Navy v. Egan*, 484 U.S. 518, 527 (1988). Thus, "since the Washington Administration, Presidents and their senior advisers have repeatedly concluded that our constitutional system grants the executive branch authority to control the disposition of secret information." *Whistleblower Protections for Classified Disclosures*, 22 Op. O.L.C. 92, 97 (1998); *see also Presidential Certification Regarding the Disclosure of Documents to the House of Representatives Under the Mexican Debt Disclosure Act of 1995*, 20 Op. O.L.C. 253, 269–76 (1996). Courts, too, have "shown the utmost deference to Presidential responsibilities" over the control of "military or diplomatic secrets." *United States v. Nixon*, 418 U.S. at 710.

The Act, however, allows withholding only when disclosure would reveal certain kinds of classified information or would "cause identifiable or describable damage to national security, military defense, law enforcement, intelligence operations, or the conduct of foreign relations that is of such gravity that it outweigh[ed] the public interest in disclosure." S. 3191, § 4(1). It thus could mandate the disclosure of sensitive information if the harm from disclosure is insufficiently grave or particularized. It may well be that few cold case records contain information bearing on national security or foreign relations, let alone information this statutory standard would not protect. But, to the extent they do, the Constitution requires that the President retain ultimate control over whether, when, and to whom to disclose them. President Bush deemed similar provisions in the JFK Act unduly "narrow" and explained they could not

prevent him from exercising his constitutional duty to protect national security information as he saw necessary. 1992 Signing Statement at 2004.

Finally, even privileged information that initially fits within a statutory ground for postponement would not be assured continued protection. First, S. 3191 imposes even narrower grounds for withholding during subsequent rounds of re-review. To justify any initial postponement, the Review Board must recommend a future time or event when a record may be disclosed. S. 3191, § 7(c)(3)(B). That recommendation then binds governmental entities and the Archivist when they conduct every round of annual re-review. *Id.* § 3(f)(1). Thus, after the Review Board picks a future date or occurrence that it believes should trigger disclosure, the Act does not expressly provide the President with a way to intervene at that juncture if he believes the information remains sensitive notwithstanding the Review Board's recommendation.

Second, the Act could insufficiently protect even sensitive records postponed during successive rounds of re-review. Such records would almost certainly contain privileged information. But S. 3191 mandates the disclosure of all postponed records within 25 years unless it would cause "identifiable or describable damage to national security, military defense, law enforcement, intelligence operations, or the conduct of foreign relations that is of sufficient gravity that it outweighs the public interest in disclosure," *id.* § 3(f)(4)(A)(i)(I), or would reveal certain kinds of classified information, *id.* § 3(f)(4)(A)(i)(II). That basis for disclosure is narrower than the section 4 postponement criteria, and could thus mandate disclosure even of records that continued to meet those criteria. Although the sensitivity of this information may wane over time, this is a judgment committed to the discretion of the President, not Congress. *Cf. Temporary Certification*, 41 Op. O.L.C. __, at *15 (noting that "[s]erious constitutional concerns would arise if the JFK Act were construed to require . . . premature disclosures of records while they are likely to contain still-sensitive information").[8]

---

[8] The bill also lacks any mechanism whereby legislative entities or the courts could assert any relevant constitutional privileges to protect the confidentiality of any cold case records they originated. *See In re Grand Jury*, 821 F.2d 946, 957 (3d Cir. 1987) ("[T]he legislator's need for confidentiality is similar to the need for confidentiality between judges, between executive officials, and between a President and his aides. The

**B.**

The Act also purports to interfere with the President's authority to control access to privileged information within the Executive Branch or by Congress. But Congress may not "act to prohibit the supervision [by the President] of the disclosure of any privileged information, be it classified, deliberative process or other privileged material." *Authority of Agency Officials to Prohibit Employees From Providing Information to Congress*, 28 Op. O.L.C. 79, 80–81 (2004) ("*Authority of Agency Officials*"); *see The Department of Defense's Authority to Conduct Background Investigations for Its Personnel*, 42 Op. O.L.C. __, at *9–10 (Feb. 7, 2018) ("Congress may not impair the President's control over national security information"); *Egan*, 484 U.S. at 527 (the President's "authority to . . . control access to information bearing on national security" is an incident of his Article II powers). Such interference is unconstitutional regardless of whether Congress is dictating the flow of privileged information within the Executive Branch or mandating its own access.

Like the JFK Act, this bill impedes the President's control over the dissemination of privileged information in two respects. First, it requires governmental entities to give the Review Board access to all identified cold case records, *see* S. 3191, § 5(i)(1)(A), as well as any "additional information, records, or testimony . . . which the Review Board has reason to believe" it must obtain in order "to fulfill its functions and responsibilities under this Act," *id*. § 5(i)(1)(B), all of which may contain privileged information. Decisions about when, how, and to whom to disseminate such sensitive information are central to the President's authority to supervise and manage the Executive Branch. *See Access to Classified Information*, 20 Op. O.L.C. 402, 404 (1996) ("[T]he President's roles as Commander in Chief, head of the Executive Branch, and sole organ of the Nation in its external relations require that he have ultimate and unimpeded authority over the collection, retention, and dissemination of intelligence and other national security information in the Executive Branch."

---

need for a full, frank exchange of ideas has led courts to recognize qualified privileges for each of these governmental decisionmakers.") (citation omitted); *Matter of Certain Complaints Under Investigation*, 783 F.2d 1488, 1519 (11th Cir. 1986) ("The Supreme Court's reasons for finding a qualified privilege protecting confidential Presidential communications in *United States v. Nixon*, 418 U.S. 683 (1974), support the existence of a similar judicial privilege.").

(internal citation omitted)); *Authority of Agency Officials*, 28 Op. O.L.C. at 80–81. The Review Board's obligation to order disclosure of any records that fall outside the statutory postponement criteria, coupled with its insulation from presidential supervision, make this bill far different from legislation allowing Executive Branch officials sensitive to privilege concerns to review former Presidents' records. *See Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 443–44 (1977).

Second, the Act gives congressional committees "access to any records" the Review Board has "held or created." S. 3191, § 5(k)(1). Such records will presumably include any records the Review Board obtains from other agencies to conduct its investigations and records of its own decision-making. Such records may contain a wide range of information protected by executive privilege, yet the Act purports to give the Executive Branch no choice but to disclose them. What is more, this requirement effectively supplants the accommodation process, the long-standing manner in which the Executive and Legislative Branches have traditionally balanced their respective constitutional prerogatives through negotiation. *See Congressional Requests*, 13 Op. O.L.C. at 157–59. President Bush thus objected to the constitutionality of a similar provision in the JFK Act. *See* 1992 Signing Statement at 2004–05.

## III.

This legislation also establishes unconstitutional procedures for appointing members of the Review Board. The Appointments Clause, U.S. Const. art. II, § 2, cl. 2, sets forth the respective roles of the President and Congress in appointing principal and inferior officers of the United States. Principal officers must be appointed by the President with the advice and consent of the Senate. Inferior officers may be appointed in the same fashion or by the President alone, a court of law, or the head of a department, as provided by law.

Review Board members are principal officers: they have ongoing authority to make final, binding decisions about the disposition of potentially sensitive government records, and they are supervised only by the President. Even based on "the understanding that the public disclosure of records may be postponed where necessary to protect executive privilege," as required by the 2019 Signing Statement, Review Board members would remain intimately involved in discharging a core Article II

function. And they would still, in some instances, have the final say as to whether records will be disclosed. Yet the Act purports to constrain the President's broad discretion to select principal officers by imposing a litany of restrictions on how the President may select his preferred nominees. Furthermore, in the event of vacancies on the Review Board, the Act purports to require the President to make his selections swiftly enough to satisfy a 60-day deadline for installing replacements. President Bush objected to similar restrictions on the JFK Act's Assassination Records Review Board that "purport[ed] to set the qualifications for Board members, to require the President to review lists supplied by specified organizations, and to direct the timing of nominations," in contravention of the Appointments Clause. 1992 Signing Statement at 2005. Consistent with the President's duty to implement statutes in a constitutional manner and with previous signing statements, we concluded that the President should treat S. 3191's putative restrictions on the appointments of principal officers as advisory.

## A.

Based on the Review Board's responsibilities, its members are "Officers of the United States" under the Appointments Clause, because they will "exercis[e] significant authority pursuant to the laws of the United States" and "occupy a continuing position established by law." *Lucia v. SEC*, 138 S. Ct. 2044, 2051 (2018) (internal quotation marks omitted). They exercise "significant authority pursuant to the laws of the United States" in the form of "power lawfully conferred by the government to bind third parties, or the government itself, for the public benefit." *Officers of the United States Within the Meaning of the Appointments Clause*, 31 Op. O.L.C. 73, 87 (2007) ("*Officers of the United States*"). Indeed, in many cases, the Review Board may make final determinations about disclosure that bind the government, and that type of "last-word capacity" is sufficient, though not necessary, to establish officer status. *Lucia*, 138 S. Ct. at 2054; *see Officers of the United States*, 31 Op. O.L.C. at 95. For instance, the Review Board's decisions to disclose non-Executive Branch records appear to be final and binding on the government because the President can review only decisions regarding Executive Branch records. S. 3191, § 7(d)(1). The Review Board may also have final say for many Executive Branch records because any decision to disclose such records

appears to go into immediate effect if the President fails to review it within 30 days. *See id*. Furthermore, during the re-review process, the Review Board's prescriptions for triggering events or timetables for future disclosure purport to bind governmental entities and the Archivist. *Id*. §§ 3(f)(1), 7(c)(3)(B).

Even aside from this final decision-making authority, the Review Board performs functions "within the 'executive Power' that Article II of the Constitution confers, functions in which no mere private party would be authorized to engage." *Officers of the United States*, 31 Op. O.L.C. at 90. The Review Board will execute the mandatory disclosure regime in lieu of the Executive's ordinary mechanisms for controlling access to confidential information. Not only that, it can "issue interpretive regulations" to perform those functions, S. 3191, § 5(m)—and significant authority includes the power to "interpret the law." *Officers of the United States*, 31 Op. O.L.C. at 87; *Bowsher v. Synar*, 478 U.S. 714, 733 (1986) ("Interpreting a law enacted by Congress to implement the legislative mandate is the very essence of 'execution' of the law.").[9]

Review Board members also satisfy the second criterion of officer status: they occupy continuing positions established by law. *See Lucia*, 138 S. Ct. at 2051. They have continuous duties to decide whether to

---

[9] While the Review Board can also issue subpoenas that "any appropriate Federal court" may enforce "pursuant to a lawful request of the Review Board," S. 3191, § 5(i)(1)(C), (F), (2), that does not constitute significant authority because we do not believe that these provisions give the Review Board independent litigating authority to enforce subpoenas. Rather, the Attorney General retains plenary authority to represent the Review Board in litigation, including when deciding whether to represent the Review Board in an action to enforce its subpoenas. *See* 2019 Signing Statement ("I have signed the Act on the understanding that the Board must request judicial enforcement of a subpoena through the Department of Justice, consistent with 28 U.S.C. 516 and the President's supervisory authority under Article II of the Constitution."); *see generally United States v. Hercules, Inc.,* 961 F.2d 796, 798–99 (8th Cir. 1992); *FTC v. Guignon*, 390 F.2d 323, 324–25 (8th Cir. 1968); *The Attorney General's Role as Chief Litigator for the United States*, 6 Op. O.L.C. 47, 56–57 (1982). The power to issue subpoenas does not constitute significant authority absent additional independent authority to enforce the subpoena in court, which would transform investigative authority into an executive authority to enforce the law. *See Buckley v. Valeo*, 424 U.S. 1, 137–38 (1976) (per curiam); Memorandum for Daniel J. Bryant, Assistant Attorney General, Office of Legislative Affairs, from Sheldon Bradshaw, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Abolishment of Obsolete Agencies and Federal Sunset Act of 2001, H.R. 2373*, at 2–3 (Apr. 15, 2002).

publicly disclose governmental records. The fact that the Review Board terminates in four to five years, S. 3191, § 5(n)(1), does not detract from the continuing nature of their statutory responsibilities during that term. *See Constitutionality of the Ronald Reagan Centennial Commission Act of 2009*, 33 Op. O.L.C. __, at *2 (Apr. 21, 2009).

Finally, Review Board members have all the hallmarks of principal officers. They are removable solely by the President, and they can render final decisions for the Executive Branch without the supervision, review, or approval of anyone besides the President. *See Edmond v. United States*, 520 U.S. 651, 664–65 (1997); *see also The Constitutional Separation of Powers Between the President and Congress*, 20 Op. O.L.C. 124, 150 (1996) ("*Constitutional Separation of Powers*"); *Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 684 F.3d 1332, 1339–41 (D.C. Cir. 2012); *Secretary of Education Review of Administrative Law Judge Decisions*, 15 Op. O.L.C. 8, 14 & n.11 (1991). They accordingly may not be considered "inferior officers," "whose work is directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate." *Edmond*, 520 U.S. at 663.

## B.

This legislation purports to limit the President's appointment of these principal officers in two unconstitutional ways: by overly restricting qualifications for the office and by prescribing a timetable for the President to fill any vacancies. The Appointments Clause leaves minimal room for Congress to impose qualifications for holding a principal office. "[U]nder the Appointments Clause, '[t]he President has the sole responsibility for nominating [principal officers] and the Senate has the sole responsibility of consenting to the President's choice.'" *Constitutionality of Statute Governing Appointment of United States Trade Representative*, 20 Op. O.L.C. 279, 280 (1996) ("*USTR*") (quoting *Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 487 (1989) (Kennedy, J., concurring in the judgment); *see The Federalist* No. 76, at 512 (Alexander Hamilton) (Jacob E. Cooke ed., 1961) ("In the act of nomination [the President's] judgment alone would be exercised[.]"); *The Federalist* No. 66, at 449 (Alexander Hamilton) ("[The Senate] may defeat one choice of the executive, and oblige him to make another; but they cannot themselves *choose*—they can only ratify or reject the choice, of the president.").

To be sure, the First Congress imposed a modest qualification on the office of Attorney General: the Judiciary Act of 1789 required that he be "a meet person, learned in the law." Act of Sept. 24, 1789, ch. 20, § 35, 1 Stat. 73, 92. More generally, Congress may have a role in "the prescribing of reasonable and relevant qualifications and rules of eligibility of appointees." *Myers v. United States*, 272 U.S. 52, 129 (1926). But "a restriction ruling out a large portion of those persons best qualified by experience and knowledge to fill a particular office invades the constitutional power of the President and Senate to install the principal officers of the United States." *USTR*, 20 Op. O.L.C. at 280. Even if some limited qualifications for principal officers are permissible, "where an office . . . entails broad responsibility for advising the President and for making policy, the President must have expansive authority to choose his aides." *Id*. at 281. For instance, Congress cannot constitutionally disqualify anyone "who has directly represented, aided, or advised a foreign entity . . . in any trade negotiation, or trade dispute, with the United States" from the position of United States Trade Representative, who is a principal officer. *Id*. at 279; *see also id.* at 280–81.

Under these precedents, the qualifications that S. 3191 prescribes for Review Board members clearly cross the line. Review Board members answer to no one but the President and may determine whether to release privileged material—a core Article II prerogative. The President might find it especially valuable to select members with some previous involvement in any federal, state, or local investigation or inquiry relating to any civil rights cold case, which could signal both relevant subject-matter expertise and an understanding of executive privilege concerns. Yet the Act renders that experience disqualifying. S. 3191, § 5(b)(3)(A). The Act further requires the President to pick "distinguished individuals of high national professional reputation in their respective fields," *id*. § 5(b)(3)(B), and dictates that at least one must be a professional historian and another must be a lawyer, *id*. § 5(b)(3)(C). Nominees must also be "capable of exercising . . . independent and objective judgment" and "possess an appreciation of the value of [cold case records] to the public, scholars, and government." *Id*. § 5(b)(3)(B). Taken in combination, and especially given the important and sensitive nature of the Review Board members' duties, these criteria leave insufficient "scope for the judgment and will of the person or body in whom the Constitution vests the power

of appointment"—the President. *Civil-Service Commission*, 13 Op. Att'y Gen. 516, 520–21 (1871).[10]

Adding to the Appointments Clause problem, the legislation provides that in the event of a vacancy, the President "shall . . . within 60 days" appoint a Senate-confirmed replacement to the Review Board. S. 3191, § 5(d). Unlike the provision governing the timing of initial appointments, which gives the President the discretion to determine whether a 60-day process is "practicable," *id.* § 5(b)(2)(A), the vacancies provision purports to be mandatory. But forcing the President to select a nominee within a short timeframe interferes with the President's appointment authority by limiting the amount of time he can dedicate to searching for and selecting suitable nominees. This 60-day deadline is particularly onerous because, to comply with it, the President would not only need to make his selections and resolve security clearances, but would need somehow to leave time for Senate confirmation—a process that, in recent years, has averaged well over 60 days.

Presidents have repeatedly objected that similar restrictions on the qualifications of principal officers and on the timing of their appointments violate the Appointments Clause.[11] In these signing statements, Presidents

---

[10] Helpfully, the enrolled version of S. 3191 did remedy some unconstitutional features of previous iterations of this legislation. Previous versions had required appointment of the Review Board members by the President alone or appointments by Congress, in clear contravention of the Appointments Clause. And both the introduced House and Senate versions of the bill originally purported to require the President to consider the recommendations of various private organizations, such as the American Historical Association, before selecting nominees for the Review Board—a restriction that unconstitutionally interfered with the timing of the President's selections.

[11] *See, e.g.*, Statement on Signing the Postal Accountability and Enhancement Act (Dec. 20, 2006), 2 Pub. Papers of Pres. George W. Bush 2219, 2219 (2006) ("The executive branch shall construe subsections 202(a) and 502(a) of title 39 . . . , which purport to limit the qualifications of the pool of persons from whom the President may select appointees [to the Board of Governors of the U.S. Postal Service] in a manner that rules out a large portion of those persons best qualified by experience and knowledge to fill the position, in a manner consistent with the Appointments Clause of the Constitution. The executive branch shall also construe as advisory the purported deadline in subsection 605(c) for the making of an appointment, as is consistent with the Appointments Clause."); Statement on Signing the Help America Vote Act of 2002 (Oct. 29, 2002), 2 Pub. Papers of Pres. George W. Bush 1927, 1928 (2002) ("Section 203(a)(4) purports to require the President to make appointments to the [Election Assistance] Commission no later than 120 days after enactment of the new law. . . . [T]his deadline unduly circum-

have indicated their intent to treat such restrictions as advisory. We recommended similar treatment in the President's signing statement on S. 3191.

## IV.

Finally, the Act unconstitutionally restricts the President's supervision of the Executive Branch by prohibiting the President from removing Review Board members absent cause. *See* S. 3191, § 5(f)(1)(B) (authorizing removal only for "inefficiency, neglect of duty, malfeasance in office, physical disability, mental incapacity, or any other condition that substantially impairs the performance of the member's duties"). As the Supreme Court has recognized, "Article II confers on the President 'the general administrative control over those executing the laws.'" *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 492 (2010). Accordingly, "restrictions on the President's power to remove officers with broad policy responsibilities in areas Congress does not or cannot shelter from presidential policy control clearly should be deemed unconstitutional." *Constitutional Separation of Powers*, 20 Op. O.L.C. at 169. Congress may not impose removal restrictions on officers if those restrictions would unduly interfere with the President's exercise of a core Article II function.

The President's appointing authority and his constitutional obligations to execute the laws and to supervise the Executive Branch carry with them the authority to remove executive officers. "Because the power to remove is the power to control, restrictions on removal power strike at the heart of the President's power to direct the executive branch and perform his constitutional duties." *Common Legislative Encroachments on Executive Branch Authority*, 13 Op. O.L.C. 248, 252 (1989). The Supreme Court held in *Myers* that the President's "power of removal" is "an indispensable aid" to discharging his "responsib[ility] under the Constitution for the effective enforcement of the law." 272 U.S. at 132–33. And in *Morrison v. Olson*, 487 U.S. 654 (1988), the Court stated that "*Myers* was undoubtedly correct in its holding, and in its broader suggestion that there are some 'purely executive' officials who must be removable by the President at will if he is to be able to accomplish his constitutional role." *Id.* at 690.

---

scribes the presidential appointment power."); 1992 Signing Statement at 2005 (objecting to such restrictions for the Assassination Records Review Board created by the JFK Act).

The Act's removal restrictions, however, interfere with the President's core constitutional prerogative to decide whether and how to disclose information subject to executive privilege. The Act inserts into that process a Review Board that answers solely to the President and whose members can be removed only for specified causes. "Congress may not . . . provide Executive Branch employees with independent authority to countermand or evade the President's determinations as to when it is lawful and appropriate to disclose classified information," let alone all other types of privileged information. *Applicability of the Foreign Intelligence Surveillance Act's Notification Provision to Security Clearance Adjudications by the Department of Justice Access Review Committee*, 35 Op. O.L.C. __, at *8 (June 3, 2011). That is why the Supreme Court emphasized the extent of presidential supervision over the General Services Administration when sustaining the constitutionality of legislation giving that agency responsibility for former President Richard M. Nixon's records, which included privileged materials. *Nixon v. Adm'r*, 433 U.S. at 443–44. Professional archivists' review of such records "constitute[d] a very limited intrusion by personnel in the Executive Branch sensitive to executive concerns," *id.* at 451, because they were supervised by the Administrator of General Services, who was "himself an official of the Executive Branch, appointed by the President," *id.* at 441, and expressly "subject to the direction and control of the President," 40 U.S.C. § 751(b)(1976).[12]

By purporting to insulate Executive Branch decision-makers exercising critical executive functions from plenary presidential supervision, S. 3191's removal restrictions also materially differ from the few instances where the Supreme Court has upheld restrictions on the President's authority to remove principal officers. As the Supreme Court reiterated in

---

[12] To the extent the bill were read to authorize the Review Board to direct Executive Branch agencies to re-investigate a cold case, that provision would also involve a core executive function requiring presidential supervision. *See* S. 3191, § 5(i)(1)(B) (authorizing the Review Board to "direct a Government office to . . . if necessary investigate the facts surrounding, additional information, records, or testimony from individuals, which the Review Board has reason to believe is required to fulfill its functions and responsibilities under this Act"). But the better reading of that provision—especially in light of this constitutional concern—is that it merely authorizes the Review Board to direct agencies to supply supplemental information so as to facilitate the Review Board's determinations of whether a record is a cold case record or falls within the postponement criteria.

*Free Enterprise Fund*, 561 U.S. at 493, the Court may have upheld for-cause limitations on the removal of principal officers in "'quasi-legislative and quasi-judicial'" bodies. *Id.* (quoting *Humphrey's Ex'r v. United States*, 295 U.S. 602, 628, 629 (1935)); *see also Wiener v. United States*, 357 U.S. 349, 355–56 (1958) (holding that Congress could insulate members of the War Claims Commission from at-will removal because their work had an "intrinsic judicial character"). Yet that rationale does not apply to members of the Review Board, who would be principal officers exercising purely "executive functions." *Humphrey's Ex'r*, 295 U.S. at 627; *see also Constitutional Separation of Powers*, 20 Op. O.L.C. at 169–70. The Review Board members' authority to review and disclose confidential Executive Branch information directly relates to the President's execution of the laws, and therefore must ultimately be exercised only by officers subject to direct presidential control. Congress may not use removal restrictions on principal officers as an indirect means of compromising the President's control over this core executive function. *Cf. Morrison*, 487 U.S. at 695–96 (allowing "good cause" removal restriction on independent counsel even though she exercised executive power, because she was an inferior officer with a narrow ambit); *Free Enter. Fund*, 561 U.S. at 494–95 (emphasizing that *Morrison* concerned the "status of inferior officers" and the specific "circumstances" of the independent counsel statute).

Previous Presidents have accordingly objected to restrictions on removing officers, especially principal officers. Their signing statements expressed their intention to interpret and implement removal restrictions in a manner consistent with the President's constitutional authority to supervise the Executive Branch.[13] We advised that the President follow a similar course in addressing S. 3191.

---

[13] *See, e.g.*, Statement on Signing the Floyd D. Spence National Defense Authorization Act for Fiscal Year 2001 (Oct. 30, 2000), 3 Pub. Papers of Pres. William J. Clinton 2379, 2380 (2000–01) (interpreting a for-cause restriction on removal of the Under Secretary for Nuclear Security at the Department of Energy to include "a failure to comply with the lawful directives or policies of the President" in light of the need for presidential supervision over sensitive national security functions); Statement on Signing the Social Security Independence and Program Improvements Act of 1994 (Aug. 15, 1994), 2 Pub. Papers of President William J. Clinton 1471, 1472 (1994) (noting "significant constitutional question" regarding the removal restriction on "the single Commissioner [of the Social Security Administration] only for neglect of duty or malfeasance"); *cf.* Statement on

## V.

For the reasons set forth above, we concluded that several provisions in S. 3191 raise serious constitutional concerns. We thus advised that the President should issue a signing statement explaining how he would interpret and implement constitutionally problematic provisions. Consistent with this advice, the President issued the January 8, 2019 signing statement upon signing S. 3191 into law.

SARAH M. HARRIS
*Deputy Assistant Attorney General*
*Office of Legal Counsel*

---

Signing the Intelligence Authorization Act, Fiscal Year 1990 (Nov. 30, 1989), 2 Pub. Papers of Pres. George Bush 1609, 1610 (1989) (objecting that a requirement that the President "immediately communicate . . . the reasons" for removing an Inspector General would "burden [the] exercise" of "the President's constitutional authority to remove an executive branch subordinate").